489 A.2d 733

**2401 PENNSYLVANIA AVENUE CORPORATION, trading as 1528 Walnut Street, Appellant,**

v.

**FEDERATION OF JEWISH AGENCIES OF GREATER PHILADELPHIA, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1984.

Decided March 18, 1985.

Thomas P. Monteverde, Jean C. Hemphill, Philadelphia, for appellant.

Richard M. Squire, Susanna E. Lachs, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.*

This appeal[1] raises the question of whether there was an anticipatory breach of the lease agreement between the appellant owners of the building at 1528 Walnut Street (hereinafter referred to as "Walnut"), and the Federation of Jewish Agencies of Greater Philadelphia ("Federation"). At trial the Court of Common Pleas of Philadelphia County concluded that Federation had committed an anticipatory breach of its lease and entered judgment in favor of Walnut. Damages were assessed at Two Hundred Ninety-two Thousand Dollars ($292,000) plus interest.

On appeal a Superior Court panel determined that the lower court erred in its application of Pennsylvania contract law to the facts of this case. On the grounds that the evidence did not support the finding of an anticipatory breach and that the lower court had erroneously imposed on the Federation a duty to occupy the premises in addition to its obligation to pay rent, the Superior Court reversed and vacated the judgment against Federation. This Court granted Walnut's petition for allowance of appeal on February 29, 1984.

### I.

In 1971, Federation decided that its headquarters was inadequate and appointed a search committee to find a new site. After a year and a half the committee recommended that Federation demolish its own building and construct a new one at its location at 1509–13 Walnut Street rather than buy an existing building at another site.

The Federation developed a plan to implement this recommendation. Under that plan Federation was to relocate for the two years during which the demolition and construction at its own location would take place. Therefore, Federation

---

* This case was reassigned to the writer on December 4, 1984.

1. This Court is vested with jurisdiction pursuant to 42 Pa.C.S. § 724.

entered a lease agreement with Walnut for the rental of four floors of the building at 1528 Walnut Street.

The lease, dated November 8, 1973, provided for rental by Federation of space for a period of two years beginning May 1, 1974 and ending April 30, 1976. Attached to the lease before its execution by Federation was a letter, also dated November 8, 1973. The letter indicated that, as Federation well knew,[2] part of the space referred to in the lease was then occupied by Catalytic, Inc. ("Catalytic") whose lease would not expire until August 31, 1974. Every effort was promised to be made to tender delivery to Federation as close to May 1, 1974 as possible.

Catalytic estimated that it would be able to vacate the premises some time in May of 1974. That move was delayed, however, by a sheet metal worker's strike in May, 1974, which prevented prompt completion of the Center Square building project into which Catalytic was to move. These circumstances indicated to Catalytic that not only would it be unable to vacate the premises on Walnut Street during May, 1974, but also that it would have trouble meeting the August 31st deadline. Catalytic, therefore, requested an option to extend its lease for up to ninety (90) days from the August 31, 1974, deadline. Walnut refused this request noting its obligations to lease the space to Federation.

2. The text of the letter indicates specifically that the Federation had been apprised of Catalytic's occupancy and the tenure of its lease. The letter states:

> As you understand, the premises being demised are now occupied by Catalytic, Inc., whose lease expires August 31, 1974. They have indicated to us and we have advised you accordingly, that they will make every effort to give the Federation possession as close to May 1st as possible.
>
> If, however, they are unable to move into the new quarters, it may be necessary for them to remain beyond May 1, 1974 on these floors, but in no event beyond August 31, 1974, which is the expiration date of their lease.
>
> In order for this to be a matter of record, will you please sign and return a copy of this letter acknowledging receipt of the Lease Agreement indicated above.

During May and June of 1974 there was frequent correspondence between Catalytic, Walnut, Federation and those involved in the Center Square project on the subject of an extension of Catalytic's lease at 1528 Walnut Street. During that time Federation indicated its disappointment but accepted the fact that it would not be able to obtain possession until September 1, 1974.[3] In acquiescing to the delay until September 1st, Federation never agreed to any extension beyond that time even though repeatedly asked to agree.

Meanwhile, in late June Federation executives became aware of a building for sale at 226 South Sixteenth Street which would more than adequately meet Federation's needs for permanent headquarters. On July 1st that building was purchased and Federation abandoned all plans to demolish and rebuild at its old location. A newspaper account of this transaction indicated that Federation had been motivated to make this purchase by the amount of money it would save on construction costs and rental fees in the temporary location.

Subsequent to Federation's purchase of its new site, Catalytic continued to endeavor to get an extension from Walnut. Walnut repeatedly refused stating that it would not agree to the extension unless Federation approved. Federation, however, refused to give its approval claiming that it did not wish to lend any validity to the contract by agreeing to the extension.

At a meeting on August 1, 1974 Federation stated its position more specifically. Federation claimed that its lease with Walnut was invalid because Walnut had failed to deliver possession by May 1st which it claimed to be the date for delivery under the lease. Therefore Federation claimed that it could not give its approval without abandoning its claim of invalidity of the contract. Contrastingly,

3. In his letter of June 20, 1974 Donald B. Hurwitz, Executive Vice President of the Federation, stated: "Obviously we have no alternative, but I sincerely hope the problem will be resolved and that the period of delays will therefore, be curtailed." (R. 742a).

however, Ronald Rubin, then Assistant Treasurer of Federation, declared to Walnut agents that Federation "did not want to occupy [the four floors], had no use for it and would not consider any type of extension without a release of liability from the lease." Exhibit 50, R. 796a.

On August 5, 1974, Walnut, relying on advice of counsel that Federation had anticipatorily breached the lease agreement, acquiesced to pressure by Catalytic and granted the ninety-day (90) extension on Catalytic's lease. Catalytic exercised its option to extend its lease beyond August 31st and remained in the space until October 31, 1974.[4]

Despite Catalytic's continued tenancy Walnut sent a bill to Federation on October 24, 1974 for rent due from October 6th through the 31st. Federation refused to pay reiterating its claim that the lease was void. Walnut commenced this action in February, 1975, seeking damages alleged to have occurred as a result of Federation's breach of the lease agreement.

## II.

To resolve the dispute between these two parties this Court must address two issues. The first is whether there was an anticipatory breach by Federation of its lease agreement with Walnut. Secondly, if we conclude that there was no breach by Federation we must determine whether Walnut's grant of the extension to Catalytic constituted a material breach of the lease.[5]

4. Part of the space was vacated on October 6th but the entire area was not delivered until October 31st.

5. Walnut alleges that it should have been granted reargument by the Superior Court because Judge Phyllis Beck, a panel member, failed to recuse herself. Walnut claims that Judge Beck's participation in the consideration and determination of this case by the Superior Court's panel gives the appearance of impropriety since she was a substantial contributor and had paid dues to the Federation and because her law clerk was the mother of one of the Federation's attorneys. In view of our independent entertaining and disposition of the matter, the request for reargument before the Superior Court need not be considered. Our independent consideration also moots any issue of the possible appearance of impropriety on the part of Judge Beck.

In analyzing the issues presented here we note that the Court is bound by the trial judge's findings of fact unless those findings are not based on competent evidence. Conclusions of law, however, are not binding on an appellate court whose duty it is to determine whether there was a proper application of law to fact by the lower court. *Lawner v. Engelbach,* 433 Pa. 311, 249 A.2d 295 (1969). Our inquiry here, therefore, is limited to whether the trial court properly concluded that Federation had anticipatorily repudiated its lease and excused any subsequent performance by Walnut of its obligations under the contract.

## A.

The requisite elements of an anticipatory breach were established by this Court in *McClelland v. New Amsterdam Casualty Co.,* 322 Pa. 429, 185 A. 198 (1936). This Court, following the standards set out by the U.S. Supreme Court in *Dingley v. Oler,* 117 U.S. 490, 6 S.Ct. 850, 29 L.Ed. 984 (1886), stated that to constitute anticipatory breach under Pennsylvania law there must be "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *McClelland v. New Amsterdam Casualty Co., supra* 322 Pa. at 433, 185 A. 198. The McClelland standard is still the rule of law in Pennsylvania. *See, William B. Tanner v. WIOO, Inc.,* 528 F.2d 262 (3d Cir.1975); *McCloskey v. Minweld Steel Co.,* 220 F.2d 101 (3d Cir.1955); *Alabama Football, Inc. v. Greenwood,* 452 F.Supp. 1191 (D.C.Pa.1978); *Wolgin v. Atlas United Financial Corp.,* 397 F.Supp. 1003 (E.D.Pa. 1975), aff'd. *mem.,* 530 F.2d 966 (3d Cir.1976); *Shafer v. A.I.T.S., Inc.,* 285 Pa.Super. 490, 428 A.2d 152 (1981).

The facts of this case indicate no statement or action which constituted an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so. There are only three instances that could arguably be interpreted as amounting to an anticipatory breach. Upon analysis, it is apparent that these instances do not

meet the *McClelland* standard either standing alone or considered in combination.

The relevant facts as found by the trial court are as follows:

(a) on July 24, 1974 [Federation's] statement that "he was advised that *the lease would have no effect* because of the inability of [appellant] to give possession in *May* as called for in the lease;"

(b) an inconclusive meeting with [Federation] on July 30, 1974, followed by

(c) a meeting with [Federation] on August 1, 1974, at which time [Federation] declined to grant an extension because "they were being advised by their attorneys that any extension given by the Federation *would in essence, acknowledge the validity of the lease,"* and

(d) on this same date [Federation's] ... informing [Walnut] that "the Federation did not want to occupy [the four floors], had *no use* for it, and would *not consider any type of extension without a release,* of liability from the lease." [Emphasis in original].[6]

Whether viewed individually or collectively these statements are insufficient to meet McClelland's requirement of an absolute and unequivocal refusal. The July 24th statement that appellee had been advised that the lease would have no effect because of appellant's failure to deliver the space in May is insufficient because it does not provide a definitive indication that appellee intends to act on this advice or treat the contract as void. Appellee's August 1st statement that it did not wish to approve an extension for Catalytic because it would lend validity to the lease does not indicate that it will in fact not perform. Moreover, appellee's statement that it had no use for the space and would not consider approving the extension without a release from its obligations under the lease indicates that

6. Appellant, Walnut, has asserted that the Superior Court misread the findings of fact made by the trial court. Therefore, to avoid confusion the findings above were cited directly from the trial court's opinion.

appellee did recognize at the very least a possible obligation under the contract. The fact that a party seeks to preserve what it deems to be a legal defense to the required performance does not reflect an intention to deliberately breach the agreement. To the contrary, it reflects an intention to avoid performance only if there is a legal basis for the refusal of performance.

The rationale behind the rule of anticipatory repudiation is the prevention of economic waste. An obligee/plaintiff should not be required to perform a useless act as a condition of his right to recover for a breach when the obligor has demonstrated an absolute and unequivocal refusal to perform. *Baldwin v. Transitone Automobile Radio Corp.*, 314 Pa. 10, 169 A. 755 (1934); *Weinglass v. Gibson*, 304 Pa. 203, 155 A. 439 (1931); *Clavan v. Herman*, 285 Pa. 120, 131 A. 705 (1926); *Greenlee v. West*, 71 Pa.Super. 468 (1919). However, we reject any argument suggesting a dilution of our long recognized standard of an "absolute and unequivocal refusal to perform."[7] Our efforts to avoid economic waste must not be allowed to encourage precipitous breaches of contract. Such an approach undermines the stability of contracts and encourages unnecessary litigation.

In conclusion we hold that there was no anticipatory breach of the lease agreement by Federation since it did not utter an absolute and unequivocal refusal to perform or a definite and positive statement of an inability to fulfill its obligations under the contract.[8]

---

**7.** We reject Walnut's argument that the definition of anticipatory breach stated in Section 250 of the Restatement (Second) of Contracts is a mere explication of the *McClelland* standard. Section 250 would allow a finding of anticipatory breach in a situation where there was only an apparent inability to perform under the contract. That provision clearly represents an unacceptable dilution of the *McClelland* rule.

**8.** We note that both lower courts addressed the issue of whether Federation had a duty to occupy under the lease. We agree, however, with Judge Spaeth's concurring statement that it is unnecessary to decide this issue since the opportunity for Federation to occupy the premises was thwarted by Walnut's grant of an extension to Catalytic the tenant then in possession.

## III.

Having concluded that Federation did not anticipatorily breach its lease agreement with Walnut we must now address the issue of whether Walnut materially breached the lease by granting the extension of Catalytic's lease for ninety days. That extension allowed Catalytic to remain lawfully in the space until November 31, 1974.

Appellant claims that it was under no obligation to deliver possession to Federation on September 1, 1974 because the lease agreement contained a clause prohibiting forfeiture by the Federation by reason of delay in delivery where that delay was caused by the failure of the existing tenant to vacate the space. Clause 22 of the contract states:

22. In the event that the herein demised premises are not ready for lessee's occupancy at the time herein fixed for the beginning of the term of this lease, because ... of the failure or refusal of the tenant of the said demised premises ... to vacate and surrender up the same ... this lease ... shall not be effected [sic] thereby.

Regardless of whether we agree with Walnut's assertion that it had no duty to deliver possession by September 1, 1974 if its existing tenant refused to leave the demised premises by the August 31, 1974, deadline, we must conclude that this clause is inapplicable to the facts of this case. Since Clause 22 refers only to the instance where the existing tenant holds over it is irrelevant to our determination in the instant case where the tenant remained on the premises by written agreement with the lessor. Thus, it is Walnut's approval of the extension rather than Catalytic's recalcitrance which prevented Federation from taking possession by September 1, 1974.

 More importantly we conclude that because Walnut signed the extension of Catalytic's lease and affirmatively acted to keep Catalytic on the premises despite its lease with Federation Walnut materially breached its own obligations under the lease. As the Superior Court properly stated there is an implied covenant of quiet enjoyment

accompanying every lease of real property. When the tenant is prevented from taking possession under the lease by affirmative acts of the lessor then that covenant is breached. *Pollock v. Morelli*, 245 Pa.Super. 388, 369 A.2d 458 (1976); *Easton Theatres v. Wells Fargo*, 265 Pa.Super. 334, 401 A.2d 1333 (1979), *appeal dismissed*, 498 Pa. 557, 449 A.2d 1372 (1982). Walnut breached this covenant by the affirmative act of signing the agreement to extend Catalytic's lease.[9]

We therefore hold that Federation did not breach anticipatorily its lease with Walnut and that Walnut, whose actions were not excused by a prior breach, must be held liable for its failure to perform under the terms of the lease. Accordingly, we affirm the order of the Superior Court for the reasons herein stated.

LARSEN, J., files a dissenting opinion.

HUTCHINSON, J., files a dissenting opinion in which ZAPPALA, J., joins.

LARSEN, Justice, dissenting.

The appellant in this case is the 2401 Pennsylvania Avenue Corporation, trading as 1528 Walnut Street (hereinafter referred to as "Walnut"). On November 8, 1983, Walnut entered into an agreement with appellee, the Federation of Jewish Agencies of Greater Philadelphia (hereinafter referred to as "Federation"), for the leasing of four floors of an office building located at 1528 Walnut Street in Philadelphia.

This protracted litigation began in February, 1975, when Walnut filed a complaint in assumpsit in the Court of Common Pleas of Philadelphia County alleging that Federation had breached the lease agreement, and sought damages alleged to have accrued as a result of said breach. Following a non-jury trial, the Honorable William M. Maru-

---

**9.** There can be no dispute that preventing the tenant from taking possession for three months of a two-year lease constitutes a material breach.

tani ruled in favor of Walnut on June 24, 1980 and assessed damages of approximately $292,000 plus interest against Federation.[1] A Superior Court panel (Spaeth, Brosky and Beck, JJ.) unanimously reversed the lower court and vacated the judgment award. 319 Pa.Super. 228, 466 A.2d 132 (1983) (Opinion per Brosky, J., with Spaeth, J. filing a concurring statement joined by Beck, J.) This Court granted Walnut's petition for allowance of appeal on February 29, 1984. I would reverse the decision of the Superior Court and reinstate the judgment award of the trial court.

Most of the facts are not in dispute, although the inferences arising from those facts are vigorously contested. The record discloses the following facts.

In 1973, Federation had decided to replace its headquarters at 1511 Walnut Street. A Site Search Committee failed to locate an acceptable permanent headquarters and, so, the decision was made that Federation would secure temporary facilities to use while the existing headquarters was demolished and replaced with a new structure. To that end, a lease agreement was entered into with Walnut on November 8, 1973 which provided for a two year lease period.

Originally, the lease agreement contemplated a beginning date of May 1, 1974. However, a simultaneously executed addendum established a beginning date no later than September 1, 1974. This addendum provided:

As you understand, the premises being demised are now occupied by Catalytic, Inc., whose lease expires August

1. Walnut informs us that "because the defendant is a well known and influential Jewish charity, the parties agreed that it should be tried non-jury before one of three non-Jewish judges satisfactory to both sides." Brief for Appellant at 5. I am offended by the innuendo that a determination by a Jewish judge of the Court of Common Pleas of Philadelphia County might somehow be suspect merely because one of the parties was a Jewish charitable organization. Moreover, I disapprove of this blatant judge-shopping per private agreement of the parties to a law suit. The selection and assignment of judges is strictly a matter of Judicial Administration within our Unified Judicial System, not a matter that is to be negotiated by and between litigants. See Pennsylvania Rules of Judicial Administration Nos. 701, 702, 703, 706.

31, 1974. They have indicated to us and we have advised you accordingly, that they will make every effort to give the Federation possession as close to May 1st, as possible.

If, however, they are unable to move into their new quarters, it may be necessary for them to remain beyond May 1, 1974, on these floors, but in no event beyond August 31, 1974, which is the expiration date of their lease.

In order that this may be a matter of record, will you please sign and return the copy of this letter acknowledging receipt of the Lease Agreement indicated above.

Catalytic, Inc., the tenant at 1528 Walnut Street, had plans to lease a new facility under construction that was known as Centre Square. A labor strike at Centre Square during the spring and summer of 1974 delayed completion of that project, eliminating any chance that Federation might move into 1528 Walnut Street by May 1st and perhaps placing the September 1st start date in jeopardy.

Due to the uncertainties created by the labor strike (which was apparently settled by mid-July, 1974), Walnut attempted to obtain an agreement from Federation to extend the beginning date of their lease beyond September 1, 1974 if necessitated by Catalytic's inability to vacate the premises before that date. At first, Federation was cooperative and appeared to acquiesce to the extension, albeit reluctantly. This initial cooperation is not surprising in view of the fact that several key officials in Federation's hierarchy also had proprietary or financial interests in the construction project at Centre Square and wanted to avoid difficulties with Centre Square's new tenant, Catalytic, Inc. These key officials were: Morris A. Kravitz, Federation's then President, who had an ownership interest in Centre Square; Sylvan M. Cohen, Federation's counsel, who had an ownership interest in Centre Square; and Albert Eisen, a member of Federation's Site Search Committee and an executive of Albert M. Greenfield & Co., the real estate company that managed Centre Square.

On May 28, 1974, Mr. Eisen sent a letter, on Albert M. Greenfield & Co. stationary, to Mr. Donald Hurwitz, Executive Vice President of Federation, which stated in pertinent part:

> You may recall that I spoke to you about four weeks ago concerning the possibility of a hold-over by Catalytic Construction as a result of inability to complete their space at Centre Square.... [O]ur estimate at this time is that the Catalytic space will not be ready until some time near the end of August and it may be necessary to extend that period into September.
>
> At the request of several of the gentlemen copied below ["cc: Messrs. Philip S. Seltzer, Morris A. Kravitz, Sylvan M. Cohen, Ronald Rubin", all officials of the Federation] I am asking for your agreement at this time to go along with whatever period is necessary for us to complete Catalytic's space in order that we can turn over possession of the area they are vacating to the Federation....
>
> Obviously, we will do everything possible to get Catalytic out of the space as soon as practical, but we would appreciate your assistance at this time in this matter.

Exhibit 17, R. 736a. Mr. Hurwitz responded, by letter of May 30, 1974, that although Federation was disappointed by the delay, "facts are facts and have to be faced" and indicated "[w]e'll all have to do the best we can and hope things work out satisfactorily." Exhibit 18, R. 737a. On June 20, 1974, Mr. Hurwitz wrote another letter to Eisen in response to Eisen's request for a ninety day extension by Federation. Hurwitz' letter stated "[o]bviously we have no alternative ... sometimes, circumstances make decisions and that's all there is to it." Exhibit 23. R. 742a.

Meanwhile, on about June 24, 1974, an alternative headquarters site at 226 South 16th Street came to the attention of Federation's Site Search Committee.[2] This location had not been previously available and was a much more attrac-

2. The minutes of Federation's June 28, 1974 cabinet meeting indicates that 226 South 16th Street had first been examined by members of the Site Search Committee on June 24, 1974. Exhibit 27, R. 751a.

tive site for Federation's new headquarters, primarily because of the substantial savings (approximately 2 million dollars) that would result from a "very reasonable" selling price, from eliminating a move to temporary headquarters and back, and from the sale of the present headquarters at 1511 Walnut Street. Accordingly, at a meeting held on June 28, 1974, Federation's Cabinet unanimously adopted a resolution to purchase 226 South 16th Street as the new permanent headquarters building. Exhibit 27, R. 753a. Additionally at this meeting, the "question of the lease on 1528 Walnut Street was brought up, and it was pointed out that the space has not been delivered to Federation in time and that a special agreement on price to Federation is involved." *Id.* On July 2, 1974, the property at 226 South 16th Street was purchased as the new Federation headquarters and the plans for temporary relocation pending demolition and construction of a new headquarters at 1511 Walnut Street were abandoned. *See* Exhibit 28, R. 757a (letter of Philip Seltzer as President of Federation to Federation Board of Trustees).

On July 17, 1974, an article appeared in a local newspaper which confirmed that Federation had abandoned its original plans because of the tremendous savings it would realize and that Federation intended to move into the new headquarters in January, 1976. There was no indication in either the newspaper accounts or the minutes of Federation meetings prior to this purchase that the property was acquired because of any delay in the Centre Square project and the consequent possibility that Catalytic *may* not have been able to vacate 1528 Walnut Street by September 1, 1974. All indications were, rather, that the acquisition of the 226 South 16th Street headquarters and abandonment of prior plans were motivated solely by the substantial financial benefits to be derived.

After the acquisition of the new headquarters, Federation became unreceptive to Walnut's continued attempts to secure an extension agreement for the beginning date of the lease at 1528 Walnut Street, and Federation officials who

also had interests in the Centre Square project withdrew their support for such extension. Federation at this point began to espouse the position that the lease had no legal validity since possession had not been delivered to it on May 1, 1974 (thus ignoring and contradicting the simultaneously executed addendum to the lease agreement setting a start date of no later than September 1, 1974). *See, e.g.* Exhibit 27, R. 753a *and* Exhibit 67, R. 804a–806a. On August 1, 1974, Federation declined to grant an extension to Walnut on the advice of Federation attorneys that "any extension given by the Federation would in essence, acknowledge the validity of the lease." Exhibit 50, R. 796a. Also on August 1st, Ronald Rubin, a Federation Cabinet member, stated to agents of Walnut that "of course the Federation did not want to occupy the space in 1528 Walnut Street, had no use for it, and would not consider any type of extension without a release of liability from the lease." Exhibit 50, R. 796a.

Faced with the September 1, 1974 start date, therefore, Walnut made arrangements with Catalytic to move Catalytic out of 1528 Walnut Street in late August. Walnut had agreed to pick up the costs of overtime labor expenses on the Centre Square project so that Catalytic's facility would be completed there in time for Catalytic to move into Centre Square on the weekends of August 23 and 30, 1974. Understandably however, Catalytic was not pleased with the prospect of rushing its move in light of the fact that Federation did not intend to use or occupy 1528 Walnut Street and had, in fact, informed Walnut to "start looking for a tenant for us." Exhibit 67, R. 806a. Accordingly, Catalytic began to put economic pressure on Walnut to agree to a three month extension. (This pressure took the form of an offer to lease other office space at 1528 Walnut Street which offer was conditioned upon the granting of the three month extension on the four floors that had been leased to Federation.)

Faced with this economic coercion, Walnut acceded to Catalytic's ultimatum on August 5, 1974, and granted the three month extension with an option to terminate at an

earlier date. In fact, Catalytic did terminate the extension at an earlier date and vacated three floors of the demised premises by October 5, 1974 and the fourth floor by October 30, 1974.

On October 6, 1974, Walnut transmitted a bill to Federation for rental of three floors at 1528 Walnut Street beginning on October 6th. Federation replied on October 30, 1974, that "we recognize no liability whatsoever on the part of the Federation ... to the owner of the premises in question due to the failure to deliver possession of the premises as agreed." Exhibit 105, R. 882a. The trial court specifically found as a fact that, at no time prior to October 30, 1974 did Federation expressly state to Walnut that it would not pay rental for the demised premises, nor was a demand therefor made by Walnut prior to October 6th.

Based upon the foregoing, Judge Marutani found that Federation had anticipatorily repudiated its lease agreement with Walnut, stating:

> Viewing this series of events and declarations .... we are compelled to come to the conclusion that such constituted "an absolute and unequivocal refusal [of Federation] to perform or a distinct and positive statement of inability to do so": *McClelland v. New Amsterdam Casualty Co.*, [322 Pa. 429, 433, 185 A. 198, 200 (1936).] ... After [Ronald] Rubin's triple-pronged disavowal, it would have been the height of folly for [Walnut] to cling to any shred of hope it might have harbored that the lease agreement would be observed by Federation.

> Accordingly, [Walnut's] subsequent act of seeking to minimize loss by leasing the four floors on August 5, 1974, to Catalytic, must be viewed as justified.

Slip opinion at 23–24. The court then went on to observe that if Federation's acts and declarations were assumed to be insufficient to constitute an anticipatory repudiation, then, in that event, Walnut would have been in material breach of contract for failing to tender possession of the demised premises until October 6, 1974.

On appeal, the Superior Court panel reversed the trial court's determination that Federation had anticipatorily repudiated the lease agreement. 319 Pa.Super. 228, 466 A.2d 132 (1983). In so doing, that court accepted the principal argument advanced by Federation, namely that: (1) there was no duty, either in law or per the terms of the agreement, on the part of Federation to actually occupy the premises at 1528 Walnut Street; (2) the only performance required of Federation was the duty to pay rent; (3) Federation never expressly repudiated its obligation to pay rent; and, (4) therefore, since there was not an "absolute and unequivocal refusal to perform" its duty to pay rent, Federation could not be found to have anticipatorily repudiated the lease.[3] Continuing, the Superior Court then held:

> [W]e concur with the trial court *dicta* that [Walnut's] three-month extension of the current lease was a material breach of the lease, discharging [Federation] from its obligations under the agreement. Since we have found that [Federation] did not anticipatorily breach the lease contract and that [Walnut] did materially breach, the judgment against [Federation] must be vacated.

*Id.* at 319 Pa.Superior Ct. 243, 466 A.2d 139.

Pennsylvania has long recognized that an anticipatory repudiation by an obligor to a contract[4] gives the obligee the immediate right to sue for breach of contract or, alternatively, to treat the repudiation by the obligor as justification for not performing a condition otherwise precedent to the obligor's duty, without thereby losing the right to sue for breach of contract when the time for obligor's performance arrives. *McClelland v. New Amsterdam Casualty Co.*, 322 Pa. 429, 185 A. 198 (1938); *Weinglass v. Gibson,*

---

**3.** Judges Spaeth and Beck, who joined Judge Brosky's lead opinion, found "it unnecessary to decide whether appellant had a duty to occupy the premises, for if there were such a duty, appellant [Federation] could not have breached it, since the opportunity to do so was thwarted by appellee's conduct as lessor." 319 Pa.Super. at 243, 466 A.2d at 139.

**4.** Contract principles apply, of course, to agreements for the lease of real property. *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897 (1979); *Cusamano v. DiLucia,* 281 Pa.Super. 8, 421 A.2d 1120 (1980).

304 Pa. 203, 155 A. 439 (1931); *Cameron v. Eynon*, 332 Pa. 529, 3 A.2d 423 (1939). Thus, when a theatre owner booked an entertainer to give a performance in his theatre on a given date and time, and then booked another entertainer for that same date and time and advertised the latter's performance to the public, this Court held that the first entertainer (the plaintiff) could sue for breach of contract even though plaintiff had not actually gone to the theatre to tender performance. *Weinglass v. Gibson, supra* 304 Pa. at 205–06, 155 A. 439. We held that an obligee/plaintiff is not required to perform a useless act otherwise a condition precedent to the obligor's duty to perform, and that the obligor/defendant's anticipatory repudiation "absolved plaintiff from tendering performance since performance or offer to perform by one party to a contract is excused when by the actions of the other it is manifest that it could not be accomplished." *Id.*, 304 Pa. at 206, 155 A. 439. *See generally* Murray, J., *Murray on Contracts*, §§ 207–214 (hereinafter referred to as *Murray*).

The rationale behind the rule of anticipatory repudiation is the prevention of economic waste. *See Weinglass v. Gibson, supra; Cameron v. Eynon, supra; Murray, supra* at §§ 207 and 213; Restatement Second of Contracts § 255, Effect of a Repudiation as Excusing the Non-Occurrence of a Condition.[5] It is clear that the rule of anticipatory repudiation is closely related to the rule of mitigation of damages or avoidability as a limitation on damages. *See* Restatement Second of Contracts § 350, Avoidability as a Limitation on Damages, *and, Murray, supra* at § 229, Anticipatory repudiation and the duty to mitigate damages. As Dean John E. Murray has stated, *Murray, supra* at § 213:

That the obligee has a right to insist upon performance and to perform the conditions precedent which the con-

---

**5.** Comment a to section 255 of the Restatement states: "No one should be required to do a useless act, and if, because of a party's repudiation, it appears that the occurrence of a condition of a duty would not be followed by performance of the duty, the non-occurrence of the condition is generally excused."

tract requires him to perform, *if this will not enhance the damages,* is clear. *But to permit him to ignore the repudiation and to perform his own undertakings, when this course of conduct will increase the obligor's loss, is to violate the principle that an obligee is not to be permitted to recover avoidable damages.* Most courts have rejected this notion and have reached the conclusion that the obligee may not ignore the repudiation in all cases, but must act upon it, in a proper case, at least to the extent of refraining from enhancing the damages unnecessarily. The Uniform Commercial Code permits the aggrieved party (the repudiatee) to await performance for a commercially reasonable time. In a given fact situation the repudiatee may not await performance until the time for performance arrives. If he does he will not recover damages which could have been avoided if he had treated the repudiation as a breach before the time for performance. Thus, the Code brings the law of contracts for the sale of goods within the modern prevailing view.

(emphasis added; footnotes omitted). *See* the Pennsylvania Uniform Commercial Code, 13 Pa.C.S.A. §§ 2610 (Anticipatory Repudiation) *and* 2611 (Retraction of Anticipatory Repudiation).

The key issue in the instant case is what constitutes an anticipatory repudiation. The Restatement Second of Contracts, § 250, provides:

When a Statement or an Act is a Repudiation

A repudiation is

(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach under § 243, or

(b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

*See Jonnet Development Corp. v. Dietrich Industries, Inc.,* 316 Pa.Super. 533, 463 A.2d 1026 (1983) (following

section 250 of the Restatement Second of Contracts) *and Rosenberg v. Rosenberg*, 322 Pa.Super. 293, 469 A.2d 626 (1983) (same). Under section 250 of the Restatement Second of Contracts, in order to constitute a repudiation, a party's language must be "sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." Section 250, Comment b, adopted by the Superior Court in *Rosenberg v. Rosenberg, supra.* And, of course, a party's language is not isolated but is viewed in concert with his voluntary affirmative acts that make it actually or apparently impossible to perform. Restatement § 250(b) and comments b and c.

The majority today reaffirms the definition of an anticipatory repudiation enunciated in *McClelland v. New Amsterdam Casualty Co., supra* at 322 Pa. 433, 185 A. 198, that, in "order to give rise to a renunciation amounting to a breach of contract there must be an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so,"[6] relying, *inter alia,* on *Dingley v. Oler,* 117 U.S. 490, 6 S.Ct. 850, 29 L.Ed. 984 (1886). I do not believe, however, that the *McClelland/Dingley* definition of anticipatory repudiation comports with current understanding of modern business transactions. As Dean John Murray cogently observes:

> [T]here are a number of subsequent judicial utterances [following *Dingley v. Oler, supra*] to the effect that nothing short of an absolute and unequivocal renunciation of the contract will suffice to ground an action brought for anticipatory repudiation. Both the Uniform Commercial Code and the Restatement (Second) expressly reject the holding of *Dingley v. Oler* [relied upon in *McClelland, supra*] ....

**6.** The federal courts applying Pennsylvania law have consistently regarded the *McClelland* formulation as the definitive expression of what constitutes an anticipatory repudiation in this Commonwealth. *See, e.g. William B. Tanner Co., Inc. v. WIOO, Inc.,* 528 F.2d 262 (3d Cir.1975) *and Wolgin v. Atlas United Financial Corp.,* 397 F.Supp. 1003 (E.D.Pa.1975), *aff'd. mem.* 530 F.2d 966 (3d Cir.1976).

The modern view as to what constitutes a repudiation may be stated as follows: *A positive statement by the obligor to the obligee which is reasonably interpreted by the obligee to mean that the obligor will not or cannot perform his contractual duty constitutes a repudiation.* Statements of doubt by the obligor as to his ability or willingness to perform are insufficient though such statements may suggest reasonable grounds for insecurity and ultimately constitute a repudiation. Moreover, language which, alone, would not be sufficient to constitute a repudiation, may constitute a repudiation when accompanied by some nonperformance by the obligor. *A positive manifestation that the obligor cannot or will not perform need not be expressed in language. It may be inferred from conduct which is wholly inconsistent with an intention to perform.* Any voluntary affirmative act which actually or apparently precludes the obligor from performing amounts to a repudiation.

*Murray, supra* at § 208 (footnotes omitted; emphasis added).

In Pennsylvania, the General Assembly has adopted the modern view in enacting section 2–610 of the Uniform Commercial Code, 13 Pa.C.S.A. § 2610, which provides:

### Anticipatory Repudiation

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:

(1) for a commercially reasonable time await performance by the repudiating party; or

(2) resort to any remedy for breach (section 2703 or 2711), even though he has notified the repudiating party that he would await performance by the latter and has urged retraction; and

(3) in either case suspend his own performance . . . .

1979, Nov. 1, P.L. 255, No. 86, § 1, effective Jan. 1, 1980.

On what acts constitute an anticipatory repudiation, the Code adopts a rule of "reasonableness". Comment 2 provides:

It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation.

I agree with the Circuit Court of Appeals for the Third Circuit that it is desirable that Pennsylvania recognize a consistent rule of anticipatory breach governing all contracts, whether within or without the Uniform Commercial Code. *William B. Tanner Company v. WIOO, Inc.*, 528 F.2d 262, 271 (3d Cir.1975). As 13 Pa.C.S.A. § 2610 represents the legislature's most recent expression on the law of anticipatory repudiation and adopts the modern view with respect to contracts within the Code, it is inconsistent and unwise to cling to the outmoded definition of anticipatory repudiation expressed in *McClelland v. New Amsterdam Casualty Co., supra.* Accordingly, I would adopt the modern view and approve the formulation of the Restatement Second of Contracts for contracts outside of the operation of the Code, namely that, in "order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that a party will not or cannot perform," section 250, Comment (b), and that language which, standing alone, might be insufficient to constitute a repudiation, may nevertheless constitute a repudiation when accompanied by voluntary, affirmative acts of the obligor manifesting an inability to perform and/or indicating a lack of intention to perform. *Id.; Murray, supra* at § 208. *See Jonnet Development Corp. v. Dietrich Industries, Inc., supra and Rosenberg v. Rosenberg, supra.*

Applying the foregoing principles to the instant case, I would have no difficulty affirming the conclusion of the trial court that Federation had anticipatorily repudiated the lease agreement with Walnut, thus excusing the latter's obligation to tender performance (i.e., possession) on September 1, 1974. From the record, it is clear that as of late

June, 1974, Federation had no intention of ever taking possession of the premises at 1528 Walnut Street and that its reason for the change of heart was not due to the possibility of Catalytic's holdover beyond September 1st but was, rather, motivated solely because of the substantial financial benefits to be reaped by purchasing 226 South 16th Street as its permanent headquarters.

By early August of 1974, Federation had made it crystal clear that it had no intention of occupying 1528 Walnut Street and that it considered—wrongly and unreasonably—the lease to be invalid because possession of the premises had not been tendered *in May*. Moreover, Federation had directed Walnut to find a new tenant for the premises, which is exactly what Walnut attempted to do.

Arrangements had been made by Walnut to remove Catalytic from 1528 Walnut Street by September 1, 1974, but such a move would have required a labor-intensive effort with heavy financial expenditures. Catalytic correctly reasoned that such actions were completely unnecessary since Federation had no intention of taking possession on September 1, 1974 or at any time thereafter. Faced with Catalytic's economic ultimatum, Federation's refusal to recognize the validity of the lease and its directive to locate a new tenant, and Walnut's duty to mitigate damages, Walnut finally granted Catalytic a three month extension. Under the circumstances, I agree with the trial court that it would have been the "height of folly" to cling to a belief that Federation would honor the lease agreement. The statements and actions of Federation officials were sufficiently positive to support Walnut's reasonable interpretation that Federation would not take possession of 1528 Walnut Street on September 1st or thereafter. Accordingly, Walnut's duty to tender possession—a duty which was otherwise a condition precedent to Federation's obligation to pay rent—was excused, and Walnut was justified in suspending performance and in taking steps to avoid losses or mitigate damages. Restatement Second of Contracts §§ 255, 350;

*see Murray, supra* at § 229 (Anticipatory repudiation and the duty to mitigate damages), *and* 13 Pa.C.S.A. § 2610.[7]

The argument advanced by Federation and accepted by the Superior Court—that since it had not repudiated its *obligation to pay rent* and since it had no duty to take possession of the demised premises, it could not have anticipatorily repudiated the lease by its statements and deeds manifesting an intention not to take possession—is a smokescreen that has obscured the real issue. Whether it was *obligated* to take possession or not, Federation made it absolutely clear that it *would not* take possession of 1528 Walnut Street and, therefore, Walnut's obligation to tender possession as a condition precedent to Federation's duty to pay rent was excused.

The discussion to this point also demonstrates the error of both courts below and of the majority in holding that, if Federation was not in anticipatory breach of contract, then the failure of Walnut to tender possession until October, 1974 constituted a material breach of contract by the latter. The majority holds that "the Superior Court properly stated there is an implied covenant of quiet enjoyment accompanying every lease of real property. When the tenant is prevented from taking possession under the lease by affirmative acts of the lessor then that covenant is breached." Slip opinion at 11. The basic flaw in this reasoning is that, as Federation concedes, it had no intention of "enjoying" the demised premises, quietly or otherwise. In fact, since Federation did not intend to use or occupy the premises and since it could not sublet or assign its lease without the permission of Walnut,[8] then the only thing Federation could have done with the premises was to pay rent upon them.

7. Even under the *McClelland* formulation, I would affirm the trial court's conclusion that Federation had breached the lease agreement by anticipatory repudiation in indicating absolutely and unequivocally that it would not take possession of 1528 Walnut Street, thus excusing Walnut from performing the useless act of tendering possession. *See Cameron v. Eynon, supra and Weinglass v. Gibson, supra.*

8. The restriction against subletting or assignment is contained in paragraph 1 of the lease.

If, as Federation would have us believe, its only expectation under the lease as of late July—early August, 1974 was to pay rent for 1528 Walnut Street, then how could those expectations have been disappointed when Walnut granted Catalytic a three month extension? The ability of Federation to pay rent was unimpaired by the holdover of the prior tenant or the extension. The disingenuousness of Federation's argument—that while it was not required to take possession and had no intention of doing so, Walnut's failure to tender possession on September 1, 1974 was nevertheless a material breach—is apparent. Obviously, Federation did not negotiate and bargain for the privilege of paying rent for an unused building and any substitute tenant that Walnut may have found for the demised premises, including the holdover tenant, could *only benefit Federation* and diminish its liability on its duty to pay rent. As no expectations of Federation were disappointed and as Walnut's granting of an extension to Catalytic was a good faith and reasonable attempt to mitigate Federation's damages, Walnut's failure to tender possession until October, 1974 cannot be deemed a material breach of contract. *See* Restatement Second of Contracts, § 241, Circumstances Significant in Determining whether a Failure Is Material.

Federation also argues that, assuming it breached the contract, Walnut failed "to properly mitigate damages since it never offered the space at a rent equal to or less than that offered to Federation in attempting to re-let the premises after Catalytic vacated." Brief for Appellee at 41. It is the party who has breached the contract that bears the burden of proving that the losses could have been avoided or lessened through reasonable efforts of the damaged party. *Williams v. Masters, Mates & Pilots of America, Local No. 2*, 384 Pa. 413, 120 A.2d 896 (1956); *State Public School Building Authority v. W.M. Anderson Co.*, 49 Pa.Cmwlth. 420, 410 A.2d 1329 (1980).

Walnut presented evidence that it solicited some eighteen prospective tenants. The market for office rental space in the downtown Philadelphia area was extremely depressed

during the two year period of Federation's lease. The tenant which eventually took over the demised premises in 1977 rented the space for approximately the same price as Federation had agreed upon. *See* lower court slip opinion at 17, n. 21 and 5, n. 2. During the two year lease period, Walnut had rented other office space at 1528 Walnut Street for about that same price. While agents for Walnut may not have offered the four floors in question at less than or equal to Federation's price during the two year period, the leasing agent for Walnut testified that none of the eighteen prospective tenants contacted declined to rent the premises because of the rental price offered. Finally, Federation offered no evidence that any prospective tenants would have leased the premises had they been offered a rate less than or equal to that agreed to by Federation. From the foregoing, it is apparent that Walnut made reasonable efforts to mitigate damages, *see* Restatement Second of Contracts § 350, and that Federation, who was responsible for the loss, failed to meet its burden of proving that any of the losses sustained were avoidable.

For the foregoing reasons, I would reverse the order and decision of the Superior Court and reinstate the judgment award entered by the Court of Common Pleas of Philadelphia County.

HUTCHINSON, Justice, dissenting.

The majority reaffirms pre-existing Pennsylvania law with respect to anticipatory breach, as set out in *McClelland v. New Amsterdam Casualty Co.*, 322 Pa. 429, 433, 185 A. 198, 200 (1936). As in that case, the majority says here that an anticipatory breach is "an absolute and unequivocal refusal to perform or a distinct and positive statement of inability to do so." Based on the evidence he heard, Judge Marutani found such a refusal or inability to perform did occur. His findings were affirmed against exceptions. They are therefore entitled to the same deference as a jury verdict. *See Cerbo v. Carabello*, 376 Pa. 571, 575, 103 A.2d 908, 909 (1954). The majority not only

ignores them, but fails to recognize the inference of unequivocal refusal required by its own factual recital. Since the *McClelland* standard is satisfied, I find it unnecessary to consider the case under the more liberal Restatement standard supported on the appealing pragmatic grounds Mr. Justice Larsen sets out in detail in his dissenting opinion. I would simply reverse Superior Court on Judge Marutani's able opinion.

ZAPPALA, J., joins in this dissenting opinion.