**PITTSBURGH INDUSTRIAL FURNACE COMPANY, Plaintiff,**

v.

**UNIVERSAL CONSOLIDATED COMPANIES, INC., Defendant.**

**PITTSBURGH INDUSTRIAL FURNACE COMPANY, Plaintiff,**

v.

**TRUSTCORP FINANCING SERVICES, INC., Defendant.**

**Civ. A. Nos. 90–1031, 90–1032.**

United States District Court, W.D. Pennsylvania.

Oct. 7, 1991.

John Regis Valaw, Pittsburgh, Pa., for plaintiff.

William G. Sutter, Jr., Lawrence E. Flatley, Reed Smith Shaw and McClay, Pittsburgh, Pa., David J. Wicklund, Shumaker Loop and Kendrick, Toledo, Ohio, for defendant.

## MEMORANDUM OPINION

LEE, District Judge.

Defendant, Trustcorp. Financing Services, Inc. ("TFSI") pursuant to Rule 56 of the Federal Rules of Civil Procedure, has moved this Court for an Order granting summary judgment. Central to the disposition of defendant's Motion are the rights of TFSI as a secured party and the rights of Pittsburgh Industrial Furnace Company ("Pifcom"), an unpaid seller of goods, and the passage of title to goods under the Uniform Commercial Code. *See* U.C.C. § 2–319 (13 Pa.C.S.A. § 2319); U.C.C. § 2–401 (13 Pa.C.S.A. § 2401).

## BACKGROUND

During 1988, Universal Consolidated Company ("Universal"), entered into nego-

tiations with the China Metallurgical Import and Export Corporation ("CMIEC"), Tianjin branch, People's Republic of China, to provide seven lines of reengineered and rebuilt new and used equipment for a cold rolling steel mill. The project required, in part, that Universal provide twelve batch anneal furnaces. These furnaces needed to be designed and constructed.

The plaintiff, Pifcom entered into an agreement ("contract") with Universal Consolidated Company ("Universal") on January 25, 1989, whereby it agreed to provide engineering, equipment and materials necessary to construct the twelve batch anneal furnaces for the Tianjin Steel Mill.

The contract provided for Pifcom to receive $955,000 in four installments. Under its terms, Universal paid Pifcom a down payment of $95,000 plus two progress payments of $100,000 each. The balance of $660,000 was due upon shipment. (See Plaintiff's Exhibit "A"—contract "Price pages" nos. 19–20).

Pifcom performed its part of the contract in that it provided the appropriate engineering and shipped or caused to be shipped the required equipment and materials which it subcontracted with other suppliers to provide.

Pifcom directed the suppliers to ship their materials and equipment to EMPE, Inc., located in Beaver, Pennsylvania. EMPE is Universal's engineering consultant, which was responsible for refurbishing used equipment as well as accumulating and storing most of the equipment that was ultimately to be shipped to China.

Pursuant to the contract, the materials and equipment were to be shipped "FOB Points of Shipment." In accordance with Pifcom's directives, the suppliers shipped the materials and equipment to EMPE, Inc.[1]

In September of 1989, CMIEC informed Universal that it was terminating its contract. On October 5, 1989, Universal informed Pifcom that CMIEC did not intend to proceed and requested Pifcom to suspend its performance.

As of the date Pifcom received this letter, most of the equipment and materials had already been delivered at EMPE facilities. The balance of materials and equipment not yet received had already been placed in shipment.

Thereafter, Pifcom took no steps to stop delivery of the remaining equipment or to reclaim the materials and equipment which had already been shipped to EMPE until December 8, 1989, when Pifcom's counsel wrote EMPE and instructed it to stop any delivery of equipment and materials to Universal.

Pifcom did not enter into any written security agreement with Universal or make any filing regarding any security interest. Nor did its agreement with Universal provide for a conditional sale such as a "sale on approval."[2]

Pifcom asserts that it never intended to have the title to the goods pass until it was paid and claims that it had an understanding with EMPE that EMPE would act as a bailee in storing the goods for Pifcom after shipment.

TFSI: The Secured Party

TFSI provided financing for the Universal/CMIEC project and extended Universal a $6.5 million line of credit to enable it to purchase the necessary equipment and materials, to develop the necessary engineer-

---

1. See "Pittsburgh Industrial Company Proposal No. P88–2.4 Revision 4, Page 15 subtitled, "Scope of Work by Pittsburgh Industrial Furnace Company," which reads in relevant part, "This proposal also includes supply of the following materials and equipment, *FOB points of shipment;* not including export crating or containerization." (Emphasis Supplied)
 Also, See Page 17 subtitled, "Items and Services to be Provided by Others," which reads in relevant part,

"Freight from shipping points to destination, including all handling and storage charges, customs duties, taxes, shipping and insurance charges."

2. U.C.C. § 2–327(1)(a) reads in relevant part: "although the goods are identified to the contract, the risk of loss and the title do not pass to the buyer until acceptance ..."

ing for the project, and to refurbish the used equipment to be sold to CMIEC.

Accordingly, TFSI and Universal entered into a Cognovit Credit Security Agreement ("Security Agreement") dated January 11, 1989, which was amended on May 18, 1989 and October 24, 1989.

Pursuant to the Security Agreement, Universal granted TFSI a security interest in all of its accounts, inventory, general and tangibles, equipment and the products and proceeds thereof.

TFSI filed financing statements with the Prothonotaries of Allegheny County, Beaver County and with the Secretary of the Commonwealth of Pennsylvania, specifically listing the batch anneal furnaces as items of collateral.

TFSI advanced $6.5 million to Universal during its performance of the contract with CMIEC to be used by Universal to purchase new and used equipment including the batch anneal furnaces to be supplied by Pifcom.

After CMIEC canceled its agreement with Universal, and after Universal suspended its performance, TFSI declared its loan in default because it appeared that Universal would be unable to pay TFSI the amounts advanced to it under the credit security agreement.

Thereafter, in January through March of 1990, TFSI repossessed the materials and equipment located principally at EMPE, Inc., in which it asserts Universal had granted it a security interest. The items repossessed included the materials and equipment necessary for the batch anneal furnaces which had been supplied by or on behalf of Pifcom pursuant to its contract with Universal.

On October 24, 1989, EMPE executed an acknowledgement wherein it stated that all of the materials and equipment in its possession belonging to Universal were subject to TFSI's security interest including, of course, the equipment and materials relating to the batch anneal furnaces.

In its Complaint, Pifcom claims that TFSI is liable to it for converting the equipment and materials or in the alternative it claims it is entitled to replevin the goods which are presently stored at Themons, Inc., in Ellwood City, Beaver County, Pennsylvania.

In response to defendant's Motion, plaintiff asserts five arguments in support of its position that summary judgment is inappropriate. They are:

1. The contract itself and the intention of the parties is such that they explicitly agreed that title was not to transfer until shipment was delivered the high seas and payment made on or before October 30, 1989 as permitted under Section 2–401 of the Code;

2. This case involves the issue of anticipatory repudiation and under Section 2–610 of the Code, plaintiff received such notice as to cause the anticipatory repudiation, thereby terminating the contract prior to transfer of title;

3. Pifcom shipped goods to EMPE, Inc., a company with which Pifcom had a long prior business association for warehousing services;

4. The acts of Pifcom in causing components to be delivered to EMPE and to Pifcom c/o EMPE were, under Section 2–503 of the Code, were merely a tender of delivery; and

5. The materials and equipment supplied by Pifcom and it sub-contractors were actually stored at JHS Packaging Company, a separate corporation located within the EMPE warehouse building.[3]

### Standards for Summary Judgment

In interpreting Rule 56 of the Federal Rules of Civil Procedure, the United States Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) has ruled that:

"The plain language ... mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

---

**3.** Plaintiff represents JHS Packaging Company is engaged in the business of overseas delivery. It is owned by the sons of Harry Laughery, the owner of EMPE, Inc. and is allegedly a separate entity organized under the laws of the Commonwealth of Pennsylvania.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322 to 323, 106 S.Ct. at 2552.

■■■ An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Incorporated*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, the Court must view the facts in a light most favorable to the non-moving party and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Pontius v. Children's Hospital*, 552 F.Supp. 1352 (1982).

### Discussion

Section 2–401 of the Uniform Commercial Code deals with the concept of "title" and the time title passes.[4] This Section reads in relevant part:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

(a) *if the contract requires or authorizes the seller to send goods to the buyer but does not require him to deliver them at a destination, title passes to the buyer at the time and place of shipment;* but (Emphasis Supplied)

(b) if the contract requires delivery at destination, title passes on tender there.

In this light, our analysis of when title passes is governed by Article 2 and the contract language between Pifcom and Universal.

■■ Under plaintiff's contract with Universal, all of the materials and equipment were to be shipped "FOB points of shipment." Under U.C.C. § 2–319 (13 Pa. C.S.A. § 2319) when the provision in the contract is "FOB place of shipment," the seller must bear the risk and expense of putting the goods in the possession of an

---

**4.** Sales law under the UCC is essentially contract law rather than property law relying heavily upon the title concept. A cogent example is the allocation of risk of loss for goods to be delivered by an independent carrier lost or damaged during transit. U.C.C. § 2–509(1)(a) and (b) allocate the risk between the buyer and seller on the basis of the contract term, i.e. either an FOB "shipment" or "destination" contract. The UCC philosophy with respect to the title concept is best expressed in a comment to § 2–201:

"The arrangement of the present Article [2] is in terms for contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor. The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character." (emphasis supplied)

*See* John E. Murray, Jr, MURRAY ON CONTRACTS, § 76 at n. 16 (3rd ed. 1990).

independent carrier at the seller's location. U.C.C. § 2–319(1)(a).[5]

■ The seller must choose a reasonable carrier, make a proper contract for the transportation of the goods in relation to the nature of the goods, obtain and promptly deliver any appropriate documents such as bills of lading that the buyer requires to obtain the goods, and promptly notify the buyer of shipment. U.C.C. § 2–504.

■ Once the goods are delivered to the carrier, the seller has given up possession of the goods under U.C.C. § 2–401 (13 Pa. C.S.A. § 2401) and title passes to the buyer because the sellers performance with reference to the physical delivery of the goods is completed. *Harvey Probber, Inc. v. Kauffman,* 181 Pa.Super. 281, 124 A.2d 699 (1956), *Eisenhauer v. Clock Towers Associates,* 399 Pa.Super. 238, 582 A.2d 33 (1990).

■ Plaintiff's claim that it entered into an oral agreement which modified the original terms of the parties' contract is unsupported.

In his deposition testimony, Pifcom president, John A. Schifano, responded to defendant's counsel as follows:

Q. ... "The contract that you had with Universal Consolidated, Inc., it's on page 15, the second paragraph down. It says 'This proposal also includes supply of the following materials and equipment, FOB points of shipment." What's your understanding of the term FOB points of shipment?

A. Sometimes things get into these. They're really a copy of another proposal that we sent a while back. But our understanding on this whole project was that we would get paid and materials would change hands whenever this equipment was on the high seas. Universal's contract with the Chinese specifically spelled that out and my contract now with the Chinese spells out that I do not get paid for the equipment that I ship until its on the boat heading for China and that's when I was going to receive my money.

Q. So in other words—

A. It's my understanding that it was my equipment until that point.

Q. Now, what's that understanding based upon?

A. Again, verbal discussions.

Q. With whom?

A. With Universal.

Q. ... Do you know what FOB points of shipment means?

A. Generally, it means from the dock of where it is shipped from.

Depo. at 52, 53.

Plaintiff's position is not premised upon any ambiguity in the contract language, but instead is based wholly on the unsubstantiated testimony of its president. On the strength of that testimony, plaintiff asks the Court to accept its assertion that an oral modification has changed the explicit terms of the parties' contract as to the issue of title. Without addressing the evidentiary problems that cascade from such a position,[6] we will not entertain any modification of a perfectly clear instrument on the evidence presently before the Court.

If plaintiff were to retain an interest in the goods after shipment or delivery to Universal, such reservation is limited to the reservation of a security interest. *See ITT Industrial Credit v. Regan,* 487 So.2d 1047 (Fla.S.Ct.1986) 1 U.C.C. Rep.Serv.2d 274.

---

**5.** Section 2–319 must be read in conjunction with Section 2–509(1) which reads:

Where the contract requires or authorizes the seller to ship the goods by carrier

(a) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though shipment is under reservation (Section 2–505); but

(b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

Instantly, with respect to these Code provisions, it is clear that the parties' contract is explicit in its terms and is properly characterized as a shipment contract.

**6.** For a complete analysis of the evidence rule, see Murray, The Parol Evidence Process and Standardized Agreements Under the Restatement (Second) of Contracts, 123 U.Pa.L.Rev. 1342 (1975).

As we have stated earlier, plaintiff failed to obtain and perfect a security interest in the equipment and materials it shipped. *See* U.C.C. § 9–203 (13 Pa.C.S.A. § 9203).

*Universal as a Bailee*

■ Plaintiff maintains that plaintiff shipped goods to EMPE with which it had a long, prior relationship in providing Pifcom with warehousing services. There is no evidence of a bailment agreement between Pifcom and EMPE whereby EMPE would store materials and equipment supplied by Pifcom for the CMIEC project at EMPE's facilities located in Allegheny or Beaver Counties that could be relied upon to defeat TFSI's security interests.

On October 24, 1989, EMPE's president, Harry E. Loughery signed an acknowledgment in which he stated that all of the materials and equipment in the possession of EMPE belonged to Universal and were subject to the security interest of TFSI. Included were the equipment and materials related to the batch anneal furnaces supplied by Pifcom.

*Anticipatory Repudiation*

■ Plaintiff contends that prior to delivery of all or some of the goods, there was an anticipatory repudiation of the contract under U.C.C. § 2–610 which caused a termination of the contract.

On October 5, 1989, Universal contacted Pifcom by letter wherein it requested that plaintiff suspend performance of work under the purchase order as of the date of the letter. Universal also asked plaintiff to retain all materials and property in connection with the project until the matter (Universal's dispute with CMIEC) was resolved.[7]

Rather than heed this notice, plaintiff continued to perform under the contract.

While not exhaustive, there are, essentially, five responses plaintiff could have made to defendant's purported letter of repudiation: (1) plaintiff could have re-nounced its contract, with the consequence that it would thereafter be limited to the remedy of an action for restitution; (2) treat the repudiation as an immediate breach triggering all of the consequences that ensue; (3) Not commence an action immediately or rely on the repudiation as a present breach, but notify Universal of its intention to proceed with suit if the repudiation would not be retracted within a limited period of time; (4) File or present an oral demand for adequate assurances; or (5) Ignore the purported repudiation.

Instantly, plaintiff chose to ignore Universal's letter of October 5, 1989 and continued to perform under the contract. Under the language of this shipment contract, title to the equipment and materials sold passed to the buyer at the time and place at which Pifcom, the seller, completes its performance with reference to the physical delivery of the goods.

We are satisfied that plaintiff's continued performance under the contract and its failure to stop delivery or attempt to reclaim materials or equipment until December 8, 1989, defeats Pifcom's claims as they relate to title.

*RULE 56(e)*

Rule 56(e) provides, in pertinent part: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations ordenials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Plaintiff does not offer any affidavits in support of its opposition to defendant's Motion. Instead, it relies, generally, upon the deposition of John A. Schifano, taken on October 10, 1990, to refute specific posi-

---

**7.** The Court will not address whether defendant's letter of October 5, 1989, constitutes a repudiation. The modern view as to what constitutes a repudiations may be stated as follows:

A positive statement by the obligor to the obligee which is reasonably interpreted by the obligee to mean that the obligor will not or cannot perform his contractual duties constitutes a repudiation.

*See 2401 Pennsylvania Avenue Corp., v. Federation of Jewish Agencies of Greater Philadelphia,* 507 Pa. 166, 489 A.2d 733 (1985).

tions taken by defendant in its Motion for Summary Judgment which was filed March 6, 1991.

Without deciding whether plaintiff has complied with Rule 56(e), we are satisfied that Schifano's statement is equivocal and falls well short of refuting two critical elements of defendant's Motion: (1) that plaintiff performed by delivering the equipment and materials to Universal according to the terms of its contract and (2) the legal consequences of those deliveries which flows directly from the contract language resulted in the proper repossession by TFSI of collateral held by Universal.

We find there is no substantial question of material fact as to when title to the property in issue passed under the Uniform Commercial Code. Nor do we find there can be any challenge to the rights of TFSI as a secured lender. Accordingly, defendant's Motions for Summary Judgment will be GRANTED.