SMF REALTY CO., Plaintiff,

v.

John V. CONSOLINI and Michael J. Gans, Defendants.

No. 95 Civ. 1927 (LAK).

United States District Court, S.D. New York.

Nov. 16, 1995.

Stuart J. Glick, James P. Flynn, Hannoch Weisman, for Plaintiff.

Andrew J. Goodman, Anthony J. Marsico, Rosner Bresler Goodman & Bucholz, for Defendant Michael J. Gans.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This dispute concerning a contract to purchase real property is before the Court on cross-motions for summary judgment. Each side contends that it is entitled to judgment as a matter of law. Each, however, contends that if its theory does not prevail, the other is not entitled to summary judgment.

### Facts

This case is attributable in some measure to confusion engendered by the Pennsylvania Department of Environmental Resources ("DER").

On October 18, 1991, the DER issued a memorandum providing interim guidance

with respect to the clean up of fuel contaminated soils. The memorandum defined the DER's most stringent protective level for the clean up of such soils, Level A protection levels, and then stated, "Treatment of soils to meet Level A Protection Levels will result in a release of liability for those soils." (Sussman Cert. Ex. B, at 3) It was the use of the word "release" that contributed to this problem.

SMF Realty Co. ("SMF") owned the property in question, which is located in Allentown, Pennsylvania, and had a large fuel oil tank on the premises. The tank, which was removed prior to the events at issue here, evidently had been associated with some fuel contamination of the soil.

On February 10, 1993, SMF, as seller, entered into a contract to sell the premises to defendants Michael J. Gans and John V. Consolini for $1 million. At the same time, SMF leased the property to Peglin, Inc., a company of which Gans was the principal, thus permitting defendants to take possession prior to consummation of the sale. The lease was for a term of three years, granted the tenant an option to extend for two years, and would terminate upon closing of the sale.

The sale contract provided that the closing of the purchase transaction "shall occur within forty-five (45) days of Buyer's receipt of a copy of the DER Clearance (as defined in the Lease) regarding the" property. (Sussman Cert. ¶ 4, Ex. A, ¶ 3) The lease defined "DER Clearance" as follows:

> "written notice from the Pennsylvania Department of Environmental Resources of (i) covenant not to sue; or (ii) full release; or (iii) other documentation of like import, or (iv) DER certification that the contamination has been abated, cured or remediated to 'Level A' Protection Levels as defined in DER Interim Evidence Memorandum of October 18, 1991, or (v) any such other documentation as to the Buyer's reasonable satisfaction will provide assurance that DER is precluded from any further action for damages, assessments, penalties, fines or like remedies for the [property]

contamination." (Sussman Cert. ¶ 3, Ex. A, Lease ¶ 2)[1]

In late 1993, SMF submitted a report to the DER, dated September 22, 1993, concerning the soil clean up and the removal of the tank. The DER's November 22, 1993 response, which is not part of the record, was unsatisfactory to the buyers (Gans Aff. Ex. C) and evidently prompted SMF to contact the DER again. On February 2, 1994, the DER acknowledged that the report indicated that the property "meets the Level A criteria established by the Department's Guidance Document." The DER went on to caution, however, that the results set forth in the report were collected solely on behalf of a private party, that the DER had not independently verified them, that the landowner was not being released from any liability, and that the DER would take appropriate action should environmental problems develop.

On March 29, 1994, the DER again wrote to the buyers' representative in an effort to clarify its position. It noted the receipt of the report from SMF, but again noted that the DER had not independently confirmed its contents. Assuming the accuracy of the report, it indicated, the soils met Level A protection levels. It went on to say that the November 22, 1993 letter is the standard form used by the DER and pointed out that the DER does not issue clearances or affirmative releases from cleanup liability. It concluded by saying that "the Department is not presently contemplating taking any further action with regard to the SMF Realty tank closure." (Sussman Cert. Ex. C, Mar. 29, 1994 letter)

The buyers evidently remained concerned. They appear to have submitted copies of the sales contract and lease to the DER and referred to the October 18, 1991 memorandum. On June 3, 1994, the DER responded that it had "provided written notice that the soils tested meet 'Level A' protection levels," but pointed out that the October 18, 1991 DER memorandum did not expand the authority of the DER under Pennsylvania law.

---

1. Subsections (iv) and (v) were drafted by the defendants' attorneys and inserted at their insistence just prior to execution of the sale contract.

In substance, the DER thus said that it could give no release or covenant not to sue and implied that it was not in the business of giving certifications. (*Id.*, June 3, 1994 letter) Viewed in the light most favorable to the DER, its letter implicitly took the position that the word "release" in the October 1991 memorandum was not used in its technical legal sense, but merely to indicate that a clean up to Level A protection levels would remove any reason or basis for the DER to seek relief.

On July 21, 1994, SMF's counsel wrote to his counterpart on the buyers' side, expressing regret that recent Pennsylvania legislation had not altered the DER's position. He then continued:

"I believe that we probably can all agree that in fact the remediation has met the applicable level specified in the DER guidelines. Unfortunately, we can probably also agree that the letter from DER falls short of the 'certificate' that your clients would like and which is indicated to be available by DER regulations. Nevertheless, no one at DER is willing to sign such a certificate despite our having gone through local legislators, etc.

"Accordingly, there appear to be two choices. One is for your client to accept the letter which is available and in that regard, incidentally, we are looking into a new type of insurance policy which appears to provide protection to someone in the position of your client. The second choice is to go to court and force DER to appear and either have DER provide the appropriate certificate or have the court decide which of us ultimately must bear the burden caused by their position." (Gans Aff. Ex. D)

By the fall, SMF appears to have been pushing for a closing. On November 10, 1994, its counsel wrote to the buyers, enclosing copies of the DER February 2, 1994 letter and a report from the consultant who prepared the closure report for SMF. The letter took the position that these documents constituted DER Clearance as defined in the contract, a position difficult to reconcile with SMF counsel's own July 21, 1994 letter, and purported to fix a closing date forty-five days subsequent to the buyers' receipt of counsels' letter. (Sussman Cert. Ex. D) The buyers' response to this letter does not appear of record. SMF nonetheless continued the effort to procure something more definitive from DER.

On November 16, 1994, the DER's assistant counsel wrote again, repeating that the 1993 closure report submitted on behalf of SMF showed that Level A protection levels had been met. It stated also that DER "will not require additional remediation or closure activities unless it finds that data in the Closure Report has been falsified, there is a change in toxicological information regarding the contaminants, there is new information about the site or the department finds that the closure fails or does not achieve the performance it was designed to meet." (Sussman Cert. Ex. C, Nov. 16, 1994 letter) The seller provided this letter to the buyers on November 28, 1994. (*Id.* Ex. E) Further efforts by the seller to prepare for a closing continued in December. (*Id.* Exs. F, G) Finally, however, the buyers on January 23, 1995 wrote to the effect that they had no intention of purchasing the property. (*Id.* Ex. H) SMF subsequently sold the property to another buyer for substantially less that the price that Consolini and Gans contracted to pay and now seeks to recover the difference.

The nub of the dispute is whether (a) the various communications from the DER satisfied the condition of the buyers' obligation to go forward that DER Clearance, as defined in the agreement, be obtained, or (b) the buyers repudiated the contract improperly.

*Discussion*

*The Closing Condition*

■ SMF argues first that it is entitled to summary judgment because the November 16 letter satisfied the closing condition. It contends that the letter constituted a covenant not to sue, a full release, or other documentation of like import. The argument is baseless, whether viewed solely in terms of the contractual language or in the broader context of this transaction.

By insisting on a covenant not to sue, a full release, or other documentation from the DER of like import, the buyers manifestly bargained for the right to walk away from the deal unless the DER provided a document that would prevent the DER from taking any future action against the buyers with respect to the soil contamination. The November 16, 1994 letter fell far short of that, as indeed the DER took pains to point out on more than one occasion. The letter, in substance, said no more than what the parties knew anyway: the DER would not require additional remediation or closure activities if the report submitted earlier proved accurate, at least absent a change in toxicological information or a failure of the previous remediation to achieve the anticipated results. The DER therefore preserved its options and certainly did not provide the buyers with the security for which they bargained.

SMF rejoins that the DER letter was sufficient because even a general release is voidable for fraud, mutual mistake or failure of consideration. In consequence, it argues, the loopholes left by the letter were no greater than would have existed as a matter of law even if the buyers had obtained a general release.

■ This argument fails as well. The Court assumes that SMF is correct in arguing that the DER, had it given a release, could have avoided it on the basis of fraud, mistake or failure of consideration. But the case the DER would have to prove to avoid a release given by the DER could well be far different from the circumstances that would permit it to proceed in the face of the November 16, 1994 letter. In order to avoid a release on the basis of fraud, for example, the DER would have to establish that it *justifiably* had relied to its detriment on a material false statement or nondisclosure. *See Beeman v. Calvert Fire Ins. Co.,* 173 Pa.Super. 20, 94 A.2d 90 (1953). Given the

DER's ability to conduct independent testing of the site prior to giving the release, however, a court might well sustain a release even in the face of evidence that the report submitted by the seller was false. *See Emery v. Third Nat'l Bank of Pittsburgh,* 314 Pa. 544, 548, 171 A. 881, 882 (1934) (suggesting that reliance may be less justified when parties have equal access to information). A court likewise might enforce a release over a claimed mutual mistake of fact since the DER did not avail itself of its right to conduct its own inspection. *See, e.g., Smith v. Thomas Jefferson Univ. Hosp.,* 424 Pa.Super. 41, 45–46, 621 A.2d 1030, 1032 (1993); *Sanders v. Lawn Mutual Ins. Co.,* 194 Pa.Super. 491, 494–95, 168 A.2d 758, 760 (1961). Moreover, the DER would be required to prove fraud or mutual mistake by clear and convincing evidence. *Wolbach v. Fay,* 488 Pa. 239, 242, 412 A.2d 487, 488 (1980). Finally, the DER might be unable to avoid a release for lack of consideration because a written release that expresses the releasor's intent to be legally bound is binding without further consideration under Pennsylvania law. *American Equitable Assurance Co. v. Mussoline,* 201 Pa.Super. 271, 277, 191 A.2d 862, 866 (1963); 33 PA.STAT. ANN. § 6 (1995). No such impediments would stand in the way of a lawsuit by the DER absent a release. In short, while there is something to SMF's point, there is not enough. The DER documentation the buyers bargained for offered materially more protection than the November 16, 1994 letter upon which SMF relies.[2]

■ This view becomes all the more compelling against the background of the letter by SMF's attorney, dated July 21, 1994. If there were any ambiguity in the contractual language—and the Court finds none—it would be resolved by the July 21, 1994 letter. That communication demonstrates the seller's awareness that the terms of the closing

2. The discussion in the text presupposes, in SMF's favor, that the statements in the November 16, 1994 letter that might be taken as restricting the circumstances in which the DER could take further action would be enforceable against the DER. It is by no means clear that this is so. Pennsylvania, like most states, adheres to the view that estoppel does not lie

against the government. *Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 489, 410 A.2d 292, 294 (1979). Whether this principle would render the November 16, 1994 letter a nullity, thus further undermining SMF's position, need not be decided here because the letter, even if enforceable, did not satisfy the closing condition.

condition had not been met by DER correspondence prior to that date, which was not materially different from the November 16, 1994 letter upon which SMF now relies.[3] *See Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556, 560 (3d Cir.1973) (practical construction by parties may be considered in construing ambiguous agreement); *Demharter v. First Fed. Sav. & Loan Ass'n of Pittsburgh,* 412 Pa. 142, 154, 194 A.2d 214, 220 (1973) (same).

■ SMF's final point is that a construction of the closing condition in the buyers' favor—or, more accurately, a reading of the closing condition in accordance with the plain meaning of its language—"would make occurrence of the condition precedent impossible." (Pl. Reply Br. 8) While SMF contends that this supports reading the contract contrary to its plain meaning (*see id.* 8–9), it really raises an issue neither briefed nor argued by the parties: the effect of the parties' assumption that a release would be available from the DER in appropriate circumstances.[4] In essence, SMF submits that the parties executed this contract while laboring under a mutual mistake as to whether the DER ever would give a legally binding "sign off" in a situation like this.

The Court assumes *arguendo* that the record permits the inference that both parties erroneously believed when the contract was signed that the DER would "sign off" in a manner that would satisfy the closing condition. But that assumption does not aid SMF. Given the scope of potential liability for hazardous waste clean up and the evident importance this issue assumed in the parties' negotiations, the effect of any mutual mistake on this issue would be to defeat SMF's claim by precluding the formation of a contract in the first place or rendering it voidable at the buyers' option. *Loyal Christian Benefit Ass'n v. Bender,* 342 Pa.Super. 614, 618, 493 A.2d 760, 762 (1985). In either case, SMF could not enforce the contract against the buyers.

*Anticipatory Breach*

■ As noted, the sale contract provided for settlement "within forty-five (45) days of Buyer's receipt of a copy of the DER Clearance (as defined in the Lease) ..." (Sussman Cert. Ex. A, Contract, ¶ 3) The contract itself fixed no outside time limit on the receipt of that Clearance and gave the buyers no right of termination if the closing condition was not met by any particular date. The lease, however, provided for an initial term of three years (unless sooner terminated) and, at the buyers' option, for an extension in the event DER Clearance had not been received during the initial term of an additional two years. (*Id.* Lease ¶ 2) It provided further that the failure to receive DER Clearance during the term of the lease would extinguish the buyers' obligation to purchase the property. Thus, SMF had a minimum of three years in which to obtain DER Clearance. SMF therefore argues that the buyers' January 23, 1995 statement that they did not intend to purchase the property constituted an anticipatory repudiation of the purchase agreement, excused SMF from further performance, and rendered themselves liable for breach of contract. Mr. Gans, for his part,[5] contends that the January 23 statement was merely a response to SMF's demands that they close notwithstanding the unsatisfied condition and did not evidence an unequivocal refusal to go forward with the transaction in the event the condition were

---

**3.** SMF also submitted a certification by its principal in support of the view that the parties understood that the contractual language meant only that SMF had to "get the property cleaned up." (Sussman Supp.Cert. ¶ 8) Given the Court's view that the agreement is fully integrated and unambiguous, this testimony is barred by the parol evidence rule. *Nicolella v. Palmer,* 432 Pa. 502, 506–08, 248 A.2d 20, 22–23 (1968); *1726 Cherry St. Partnership v. Bell Atlantic Properties, Inc.,* 439 Pa.Super. 141, 147–151, 653 A.2d 663, 666–69 (1995). Even if it were not, the

statement is vague and does not support SMF's position.

**4.** Whether the assumption was reasonable in light of the September 22, 1993 DER letter need not be decided.

**5.** The action is brought against Messrs. Gans and Consolini, the contract vendees. As Consolini is in bankruptcy, the action is stayed against him pursuant to 11 U.S.C. § 362(d).

satisfied at some point during the term of the lease.[6]

The facts concerning the alleged repudiation are less than clear. In arguing that the January 23 letter was merely a response to demands by SMF that the buyers close, Gans points to letters from SMF's counsel dated November 28, December 22 and December 23, 1994 (Sussman Cert. Exs. E, F & G), which reflect SMF's efforts to schedule a closing on December 28, 1994. There is no indication as to what happened on that date. The January 23, 1995 document relied upon by SMF, moreover, is addressed "To whom it may concern" rather than the seller. Its purpose, and the identity of the person to whom it was written, are unclear.

■ In order to establish an anticipatory repudiation of a contract, the party seeking to establish the breach must demonstrate a clear and unequivocal refusal by the defendant to perform the defendant's contractual obligations. *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies of Greater Philadelphia,* 507 Pa. 166, 172, 489 A.2d 733, 736 (1985). In determining whether SMF is entitled to summary judgment, the evidence must be viewed in the light most favorable to the buyers and all reasonable inferences drawn in their favor. As the language and circumstances of the January 23 letter, at least to the extent disclosed on this record, leave doubt as to whether the letter is properly construed as such an unequivocal refusal, SMF is not entitled to summary judgment on this basis. *See Accu–Weather, Inc. v. Prospect Communications, Inc.,* 435 Pa.Super. 93, 99–103, 644 A.2d 1251, 1254–56 (1994).

The fact that the parties have cross-moved for summary judgment does not of itself mean that Gans is entitled to prevail on this issue. In assessing that motion, SMF is entitled to a correspondingly charitable view of the record. Viewing that record in the light most favorable to SMF, the Court cannot say that Gans has established that the January 23 letter did not reflect an unequivocal refusal to go forward. Hence, Gans'

cross-motion for summary judgment also will be denied.

*Gans' Cross–Motion for a Stay*

■ Defendant Gans asserts also as a basis for his cross-motion that plaintiff's action against him should be stayed because of the pending bankruptcy case of his co-defendant, Consolini. Gans offers several cases as authority for the proposition that the automatic stay provided to the debtor under Section 362(a)(1) of the Bankruptcy Code can be extended to a non-debtor, but he overlooks a basic principle which informs those cases. Section 362(a)(1) by its terms provides a stay only to the debtor. 11 U.S.C. § 362(a)(1) (1988). "It does not, however, extend to separate legal entities such as ... codefendants in pending litigation." 2 COLLIER ON BANKRUPTCY ¶ 362.04 (Lawrence P. King, *et al.,* eds. 15th ed. 1995). When courts act to extend the automatic stay to a non-debtor, they do so by means of their authority under Section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105 (1988). Thus, in order to achieve the Bankruptcy Code's goals of fair and orderly resolution of claims against the bankrupt estate, courts may enjoin a suit against a non-debtor defendant if it would offer a plaintiff the means to make an "end run" around the protection provided by the Code to the debtor. *E.g., A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.) (barring suit by products liability plaintiffs against bankrupt manufacturer's insurer where judgment would impede viable reorganization of the debtor and amount to a preference over other creditors), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). Even where appropriate, however, such "stays" take the form of injunctions issued by the bankruptcy court after a hearing to determine whether such unusual action is necessary to protect the administration of the bankruptcy estate. *Patton v. Bearden,* 8 F.3d 343, 349 (6th Cir.1993). The Bankruptcy Court for the

---

**6.** The fact that the DER had taken the position through 1994 that it could not give the sort of clearance contemplated by the contract does not conclusively establish that no such clearance

ever could be obtained. The policies of government agencies change. Moreover, the possibility of legislation altering the DER's position was contemplated by the parties. (Gans Aff., Ex. D)

District of New Jersey, in which Consolini's case is pending (Gans Aff. ¶ 26; Def.Mem. 5), is the appropriate forum for any such determination. *Patton,* 8 F.3d at 349.

### Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is denied in all respects. Gans' cross-motion for summary judgment, insofar as it seeks dismissal of the claim based on the premise that the November 16, 1994 DER letter satisfied the closing condition, is granted, but the cross-motion is denied in all other respects.

SO ORDERED.