**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., EAKIN, BAER, TODD, STEVENS, JJ.**

| | | |
|---|---|---|
| WAYNE HARRISON AND MARY HARRISON, | : | No. 75 MAP 2014 |
| | : | |
| | : | Appeal from the U.S. Court of Appeals, |
| Appellees | : | Third Circuit No. 12-3613, Granting |
| | : | Petition for Certification of Question of |
| v. | : | Law |
| | : | |
| CABOT OIL & GAS CORPORATION, | : | |
| | : | |
| | : | |
| Appellant | : | SUBMITTED:  October 8, 2014 |

**OPINION**

**MR. CHIEF JUSTICE SAYLOR**                **DECIDED:  February 17, 2015**

We accepted certification from the United States Court of Appeals for the Third Circuit to address whether the primary term of an oil-and-gas lease should be equitably extended by the courts, where the lessor has pursued an unsuccessful lawsuit challenging the validity of the lease.

The Third Circuit has related the material, undisputed facts along the following lines.  In August 2007, Appellee Wayne Harrison entered into a lease with Appellant Cabot Oil & Gas Corporation, per which Cabot obtained the exclusive right to explore oil-and-gas resources on Mr. Harrison's property.  In exchange, the company agreed to pay an initial bonus plus a one-eighth royalty on oil or gas successfully produced from the land.  The instrument carried a "primary term" of five years, but it also provided for an extended term "as long thereafter as oil or gas is produced . . . in paying quantities

from the premises[.]" *See generally T.W. Phillips Gas & Oil Co. v. Jedlicka*, 615 Pa. 199, 42 A.3d 261 (2012) (discussing the "paying quantities" convention frequently utilized in oil-and-gas leases). Furthermore, Cabot was provided with an option to extend the primary term for an additional five years.

Approximately halfway through the primary lease term, Mr. Harrison and his wife commenced a civil action against Cabot in a federal district court, seeking a declaration that the lease was invalid. Via an amended complaint, the Harrisons centered the litigation upon their contention that the company had fraudulently induced Mr. Harrison to enter into the lease via an agent's representation that Mr. Harrison would never receive any more than $100 per acre as a threshold bonus payment from a gas producing company. The Harrisons asserted that they subsequently learned of other landowner-lessors receiving higher payments.

Cabot denied the material allegations of the complaint and lodged a counterclaim. In this pleading, the company sought a declaratory judgment that, in the event the Harrisons' suit failed, the primary term of the lease would be equitably tolled during the period of time during which the suit was pending, and, concomitantly, the lease would be extended for an equivalent period of time beyond what was provided by its actual terms. In support of this request, Cabot alleged that the cloud upon the lease created by the Harrisons' suit had prevented the company from "prudently tak[ing] any steps to develop or commence operations on [Harrison's] leasehold as allowed by the Lease." Petition for Certification of Question of Law in *Harrison v. Cabot Oil & Gas Corp.*, No. 12-3613, at 3 (3d Cir. Apr. 7, 2014) (citation omitted; interlineations in original).

In support of its counterclaim, Cabot pointed to cases from several other oil-and-gas-producing jurisdictions holding that: 1) a lessor's commencement of a lease-validity

challenge constitutes an effective repudiation of the agreement; 2) the lawsuit and attending uncertainty renders it economically impractical for the lessee to proceed with the costly development of production infrastructure on the property; 3) it would be unfair to permit a meritless lease challenge to deprive the lessee of the benefit of its bargain, namely, the opportunity to establish production during a limited "window of opportunity" corresponding to the primary term of the lease (and thus to avoid defeasance of the lessee's corporeal interest in real property); and 4) it is therefore appropriate for the courts to award an extension of the primary lease term, measured according to the length of time the unsuccessful lawsuit was pending.[1]

Cabot sought summary judgment. Relative to its counterclaim, the company submitted a declaration from one of its land managers indicating that the cost of drilling

---

[1] *See, e.g., Rougon v. Chevron, U.S.A. Inc.*, 575 F. Supp. 95, 100 (M.D. La. 1983) ("[W]here a lessor questions the validity of a lease, the term of the lease is suspended, the logic being that the lessee has been deprived of the exercise of the rights granted to him by the lease by the act of the lessor and he is therefore granted an extension beyond the primary term for the period during the primary term when the lease was placed in jeopardy." (quoting *Hanszen v. Cocke*, 246 So.2d 200, 203 (La. Ct. App. 1971))); *Sw. Energy Prod. Co. v. Elkins*, 374 S.W.3d 678, 685 (Ark. 2010) ("Not to toll Southwestern Energy's obligation to drill as of [a particular] date would create an impossible dilemma for [the company]: either use the contested lands and potentially expose itself to more liability or refrain from using the lands and lose its investment and the one-year window . . . for development"); *Greer v. Carter Oil Co.*, 25 N.E.2d 805, 810 (Ill. 1940) ("The great weight of authority in other States holds that where the lessor brings suit to avoid an oil and gas lease and the litigation ends after the grant has expired, that the lessors are estopped to claim the lease is invalid because the term has expired, and that an additional period of time may be fixed by a court of equity in which to commence drilling operations." (citations omitted)); *cf. Kothmann v. Boley*, 308 S.W.2d 1, 4 (Tex. 1957) (directing that oil-and-gas leases were to be extended on the basis that "[l]essors who . . . wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong"); *Bingham v. Stevenson*, 420 P.2d 839, 842 (Mont. 1966) (implementing an equitable lease extension based on actions by the lessors, including the transmittal of letters denying the validity of the lease).

and completion of a specialized well generally required to produce gas from Marcellus Shale in Pennsylvania is in the range of $4 to $7 million dollars. According to the land manager, "[t]he expense associated with such drilling and completion makes it particularly impractical for an oil-and-gas producer to invest in drilling, completing a well when there is an ongoing lawsuit regarding the validity of the oil-and-gas lease." Declaration of Jeffrey Keim of Sept. 30, 2011, in *Harrison v. Cabot Oil & Gas Corp.*, No. 10-312 (M.D. Pa.), at ¶5.

The district court awarded summary judgment in Cabot's favor on the suit to invalidate the lease. The court, however, resolved the counterclaim in the Harrisons' favor, concluding that the law of this Commonwealth does not provide for equitable extensions of oil and gas leases under the circumstances. *See Harrison v. Cabot Oil & Gas Corp.*, 887 F. Supp. 2d 588, 596-98 (M.D. Pa. 2012).

In reaching this conclusion, the district court relied primarily on *Derrickheim Co. v. Brown*, 305 Pa. Super. 173, 451 A.2d 477 (1982), which prioritized the terms of a lease over equitable considerations in a circumstance in which an oil producing company forewent operation of a well until a defect in the lessor's title was resolved. *See id.* at 178, 451 A.2d at 480 ("The fact that it was 'prudent' for [a lessee] to suspend operations upon learning of [a] cloud on the title does not justify disregarding the express language of the lease."). The district court took *Derrickheim* as a signal that Pennsylvania courts would reject the equitable extension practice implemented elsewhere. *See Harrison*, 887 F. Supp. 2d at 596-97. Further, the court reasoned that, under Pennsylvania law, the mere filing of a declaratory judgment action challenging a lease does not, in and of itself, comprise a repudiation of the lease such as would implicate judicial redress. *See id.* at 597 ("Until the Pennsylvania courts say otherwise, this Court will not find that a party's filing of a lawsuit in federal court amounts to a

repudiation of a lease between the parties, despite what courts in other jurisdictions have held.").

In this regard, and more broadly, the district court relied upon a recent decision authored by a coordinate judge, *Lauchle v. Keeton Group LLC*, 768 F. Supp. 2d 757 (M.D. Pa. 2011). The *Lauchle* court additionally posited that "deeming these leases to have been repudiated under the circumstances of this case is both bad law and even worse public policy," given the superior bargaining power of oil-and-gas-producing companies relative to the drafting of leases, as well as the disincentive to the pursuit by lessors of potentially meritorious actions. *Id.* at 762.

Cabot lodged an appeal in the federal intermediate appellate court, contending that, if presented with the question, this Court "would recognize the rule that, where a lessor repudiates a lease by initiating litigation seeking to invalidate the lease, the lessee is entitled to an equitable extension of the lease term if the lessor's claim is denied." Petition for Certification in *Harrison,* No. 12-3613, at 5. In support of this position, the company pointed to other jurisdictions which have adopted such approach. *See supra* note 1.

Cabot also filed a motion requesting certification to this Court. *See* Supreme Court Internal Operating Procedures §8. The Third Circuit granted this request and applied for certification, which we accepted, recognizing that the issue was one of first impression and of significant public importance, given that its resolution may affect a large number of oil-and-gas leases in Pennsylvania.

Presently, Cabot grounds its position squarely on the principle that a party to a contract is entitled to the benefit of its bargain. *See, e.g., Ferrer v. Trs. of Univ. of Pa.*, 573 Pa. 310, 340-41, 825 A.2d 591, 609 (2002). The company posits that, if one

contracting party deprives the other of a bargained-for benefit, the law should correct the deprivation.

Cabot also explains that, in the last decade, with the discovery of the potentially vast quantities of natural gas in the Marcellus Shale reserve in Pennsylvania, and with the introduction of new means to make production of that natural gas more practical, thousands of Pennsylvania landowners have leased their property to oil-and-gas producers. *Accord* Brief for *Amici* Pa. Indep. Oil & Gas Ass'n, Marcellus Shale Coal., Chief Oil & Gas, LLC, and Sw. Energy Prod. Co. [hereinafter the "Industry *Amici*"] at 3 ("While Pennsylvania was home to the first oil well in the United States more than 150 years ago, advances in technology and discovery of the promise of the shale gas plays have dramatically increased the impact of the oil-and-gas industry in Pennsylvania in the last decade."). According to the company, disparities in lease remunerations exist due to various factors, often depending upon the timing of lease consummation (particularly given the evolving knowledge relative to Marcellus Shale); the developing state of the technology; and fluctuating market conditions. Cabot suggests that such differences have incentivized some landowner-lessors to wrongfully contest the validity of oil-and-gas leases in hopes of securing the freedom to pursue more lucrative arrangements.

The problem facing oil-and-gas-producing companies, Cabot contends, is that such lease-validity lawsuits forestall drilling and well development, given the multi-million dollar investments attending such operations. *See* Brief for Appellant at 16 ("It would be essentially impossible for a producer to place such an investment at risk while there remains pending a lawsuit seeking to invalidate the producer's interest in the property."); *accord* Brief for the Industry *Amici* at 6 ("[T]he expense of drilling generally, and especially for wells in unconventional formations such as the Marcellus Shale, is

too great for any reasonable production company to go forward with drilling while there is a pending lease challenge.").  The result, the company indicates, is that producers are deprived of the full benefit of their bargains by meritless lease challenges.  For these reasons, Cabot encourages this Court to follow the mainstream approach of other jurisdictions which have treated a meritless lease challenge as a repudiation and applied equitable remedial principles.  *See supra* note 1.  Indeed, the company highlights, this principle has become essentially one of black-letter law, as reflected in several prominent treatises in the field.[2]

Cabot recognizes that the issue is one of first impression in this Court.  According to the company, however, Pennsylvania already recognizes all legal predicates to the equitable-extension principle.  In particular, the company references the expectation remedy available to redress contractual breaches.  *See, e.g.*, *Ferrer*, 573 Pa. at 340-41, 825 A.2d at 609.  Additionally, Cabot contends, Pennsylvania law provides that a party repudiates a contract, and thus effectuates an essential breach, when he makes an unequivocal statement that he will not perform in accordance with his agreement.  *See, e.g.*, *Jonnet Dev. Corp. v. Dietrich Indus., Inc.*, 316 Pa. Super. 533, 543, 463 A.2d 1026, 1031 (1983).  The company regards the Harrison's commencement of an action as the equivalent of such a statement.

---

[2] *See* 3 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL AND GAS LAW §604.7 (2009) ("[C]ourts have almost universally held that when the lessor has brought a suit during the primary term claiming the termination of the lessee's interest, the lessee, should he prevail in such action, will be entitled to a period of time extending beyond the expiration of the primary term to gain production." (citations omitted)); 2 NANCY SAINT-PAUL, SUMMERS, OIL & GAS §14:36 (2014) ("Where a lessor has repudiated a lease by notice or suit for cancellation for alleged breach by the lessee of his express or implied covenants . . ., such act of the lessor relieves the lessee of the duty to continue further operations until the controversy is settled and estops the lessor from claiming such cessation of operations by the lessee as grounds for termination of the lease.").

In terms of the federal district courts' reliance on *Derrickheim*, Cabot argues that such decision is irrelevant, since in that case the lessor had not commenced a lawsuit. In any event, the company stresses that an intermediate appellate court's decision, such as *Derrickheim*, is in no way binding upon this Court. *See, e.g.*, *Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 418–19, 984 A.2d 478, 490 (2009). Cabot also proceeds to challenge the *Lauchle* court's public policy perspective, arguing that the equitable-extension principle only serves to restore an agreed-to equilibrium after a disruption caused by meritless litigation. *Accord* Brief for the Industry *Amici* at 2 ("While successful oil and gas development is inherently uncertain, [the equitable-extension principle] would ensure that lessors do not profit from bringing challenges to the validity of their leases that turn out to be without merit.").[3]

In response to Cabot's argumentation, the Harrisons point to the reasoning of the federal district courts in *Harrison* and *Lauchle*. *See, e.g.*, Brief for Appellees at 8 ("No Pennsylvania law has required nor even suggested that primary terms may be extended beyond their express period, especially given *Derrickheim*'s clear holding on the subject."). The Harrisons also note that oil-and-gas-producing companies frequently enter into leases then delay drilling according to their own interests and timetables. Moreover, according to the Harrisons, such companies are readily capable of negotiating appropriate tolling provisions in connection with their leases to account for the prospect of delay occasioned by lessor validity challenges. *See, e.g.*, *id.* at 33 ("[G]as companies can anticipate and manage issues relating to the length of primary terms within the context of their business relationships through the usual modes of drafting and negotiation.").

---

[3] In addition to the noted *amici* submission, Cabot's position is also supported by a separate *amicus* brief by Professor Bruce M. Kramer, who also emphasizes the weight of the authority supporting the equitable-extension principle.

Given such considerations, the Harrisons describe the equitable-extension principle as nothing more than a "judicial affirmative action program" for oil-and-gas-producing companies, which "abuses landowners who have done nothing other than exercise their legal rights." *Id.* at 8-9; *see also id.* at 26 ("Cabot effectively seeks a judicially-run affirmative action program for the benefit of oil & gas companies where the Pennsylvania courts do not enforce contractual rights but rewrite them in the companies' favor."). Consistent with *Lauchle*, the Harrisons also highlight the disparate bargaining power of landowner-lessors as compared to such companies. *See, e.g.*, *id.* at 16 ("*Lauchle* expresses significant policy considerations that further militate against judicially extending a primary term, by highlighting the control that oil & gas companies exercise over lease language and the chilling effect that an extension rule would have on landowners' willingness to bring meritorious challenges.").

The Harrisons also differ with Cabot's position that the mere filing of a declaratory judgment action represents a repudiation of a lease. Again, the Harrisons regard the implementation of a contrary approach in the setting of oil-and-gas leases as an "upend[ing]" of Pennsylvania law for the "special benefit for gas companies." *Id.* at 33.

Several landowner-lessors submitted an *amici* brief in support of the Harrisons' essential position. *See* Brief for *Amici* Pauline Beck, Ronald J. Gulla, Margeret Henry, Rebecca Roter, and Anagela and William Smith [hereinafter the "Landowner-Lessor *Amici*"]. These *amici* also stress the differential bargaining position of oil-and-gas production companies versus individual landowner-lessors. Moreover, as exemplified by the following passage from their brief, the Landowner-Lessor *Amici* regard lease-validity litigation as merely one of a number of risks encountered by oil-and-gas-

producing companies as a prerequisite to the rich rewards which may be attained by those willing to accept them:

> The speculative nature of oil and gas extraction inherently requires the assumption of large risks . . ., and production companies routinely absorb the cost of a wide variety of unsuccessful investments. They may invest millions of dollars in drilling and completing a well only to find that it is defective or "dry" and therefore must be plugged and abandoned. Companies may spend millions of dollars acquiring gas leases that they later abandon because of unfavorable market or regulatory conditions. They may choose not to develop leased acreage because greater profits are to be had by drilling somewhere else. They also may choose not to invest in production while a lease challenge proceeds, but such business judgments are commonplace and do not warrant shifting the risk of litigation from multimillion-dollar corporations to small landowners such as Mr. Harrison.

*Id.* at 7-8 (footnote and citations omitted). The Landowner-Lessor *Amici* also observe that Cabot has never manifested any intention of drilling in the vicinity of the Harrisons' property, and thus, they regard "Cabot's counterclaim [as] an opportunistic and exploitative attempt to extend the lease term until 2020, in the hope that market conditions will improve at the end of the decade." *Id.* at 13.

Preliminarily, we note that contractual remedies, including equitable ones, generally flow from a breach of an agreement. *See, e.g.*, *McShea v. City of Phila.*, 606 Pa. 88, 97, 995 A.2d 334, 340 (2010) (stating the general rule that a contract-based action seeking judicial redress requires the plaintiff to demonstrate a material breach). Cabot appears to accept this principle as applicable in the present circumstances. Accordingly, in this respect, the company asserts that the Harrisons' conduct in seeking a judicial declaration that the Cabot/Harrison lease was invalid amounted to an "anticipatory repudiation" of the lease. *See, e.g.*, Brief for Appellant at 27 ("Certainly a

lessor that files a lawsuit asking for a judicial declaration that the lease is not valid has repudiated the contract."). *See generally 2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*, 507 Pa. 166, 174, 489 A.2d 733, 737 (1985) (discussing the doctrine of anticipatory repudiation as giving rise to contract-based remedies, given that repudiation of an agreement entails an essential declaration of an intention to breach).

The difficulty with Cabot's position, however, is that this Court has required more than the mere assertion of a challenge to the validity of an agreement to demonstrate such repudiation. Under Pennsylvania law, anticipatory repudiation or breach requires an "absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *Id.* at 172, 489 A.2d at 736 (quoting *McClelland v. New Amsterdam Cas. Co.*, 322 Pa. 429, 433, 185 A. 198, 200 (1936)).

It is widely recognized, however, outside the oil-and-gas context at least, that the filing of declaratory judgment action merely contesting the validity or scope of an agreement does not entail such an unequivocal refusal to perform. *See, e.g.*, *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F. Supp. 2d 562, 568 (D. Del. 2009) (explaining that "an action for declaratory judgment does not indicate an unconditional refusal to comply with contractual obligations" and joining a "chorus of other jurisdictions in finding that . . . statements made in the context of a declaratory judgment action are insufficient to establish repudiation as a matter of law").[4] As related in the commentary to the Restatement Second of Contracts:

---

[4] This principle is most frequently referenced in the context of insurance coverage disputes. *See, e.g.*, *id.*; *see also Seneca Ins. Co. v. Shipping Boxes I, LLC*, ___ F. Supp. 2d ___, 2014 WL 2567158, *4 (E.D. Va. June 6, 2014) (explaining that the purpose of the declaratory-judgment remedy is to "guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights" (quoting *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Sup'rs*, 737 S.E.2d 1, 7 (Va. 2013))); *Lincoln Nat'l Life Ins. Co. v. Schwarz*, Civ. No. 09-03361(FLW), *slip op.*, 2011 WL 2357828, *3 (D.N.J. June 9, (…continued)

> Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his [contractual duties]. His statement is a repudiation if the threatened breach would, without more, have given the injured party a claim for damages for total breach. Modern procedural devices, *such as the declaratory judgment*, may be used to mitigate the harsh results that might otherwise result from this rule.

Restatement (Second) of Contracts §250 cmt. d (1981) (emphasis added); *accord Landwehr*, 734 F. Supp. 2d at 169 (explaining that "a declaratory judgment action 'serves to set controversies at rest *before they lead to repudiation of obligations*'" (quoting *Babb v. Superior Court*, 479 P.2d 379, 383 (Cal. 1971) (emphasis in original)).

Given the above, we view the controlling determination in this case as devolving to whether this Court will adopt a special approach to repudiation pertaining to oil-and-gas leases, as a substantial number other jurisdictions would appear to have done. *See supra* note 1. We decline to do so, however.

In the first instance, for purposes of contract law in Pennsylvania, this Court adamantly has reinforced the clear predicates of repudiation. *See, e.g., 2401 Pa. Ave. Corp.*, 507 Pa. at 174, 489 A.2d at 737 ("[W]e reject any argument suggesting a dilution of our long recognized standard of an 'absolute and unequivocal refusal to perform.'"). We acknowledge the high stakes involved in oil-and-gas exploration and production, as

---

(continued…)

2011); *Landwehr v. FDIC*, 734 F. Supp. 2d 161, 169 (D.D.C. 2010) ("[N]umerous courts have concluded that neither the filing of a declaratory judgment action nor the allegations made in support of such an action can form the basis of a claim for anticipatory repudiation."). The precept nonetheless flows from the clear prerequisites to a repudiation, *see 2401 Pa. Ave. Corp.*, 507 Pa. at 172, 489 A.2d at 736, and thus, it applies more broadly. *Cf. Lanyon Zinc. Co. v. Burtiss*, 83 P. 989, 989-90 (Kan. 1905) (holding that the mere assertion of a lease-validity challenge, in the absence of an injunction or other interference with the operations of the lessee, was insufficient to justify the assertion of a court's equitable powers to extend the lease).

well as the incentive to lessor-landowners to maximize payments attending the use of their properties. Nevertheless, we agree with the Harrisons and their *amici* that such factors do not justify a diminution of extant legal requirements or, concomitantly, a curtailment of the rights of landowner-lessors to obtain a judicial declaration concerning their rights and interests.

Significantly, in promulgating the Declaratory Judgment Act,[5] the Pennsylvania General Assembly implemented a remedial regime designed to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." 42 Pa.C.S. §7541(a). Furthermore, the Legislature prescribed that the enactment was to be "liberally construed and administered," *id.*, in furtherance of such remedial aims. In our view, it would disserve the legislative objectives to treat recourse to such procedure, alone, as a basis for altering material provisions of the agreement in controversy (*i.e.*, the lease term). Our reluctance, in this respect, is bolstered by the Harrisons' observation that oil-and-gas-producing companies are free to proceed according to their own devices to negotiate express tolling provisions for inclusion in their leases. Notably, neither Cabot nor its *amici* offer any direct response on this point. Certainly, in light of the voluminous decisional law, such companies are on sufficient notice of the prospect for validity challenges to warrant their consideration of such protective measures.

We do not foreclose that equitable relief may be available to oil-and-gas-producing companies -- subject to applicable requirements governing recourse to equity -- where there is an affirmative repudiation of a lease.[6] Our determination is only that,

---

[5] Act of July 9, 1976, P.L. 586, No. 142, §2 (as amended 42 Pa.C.S. §§7531-7541).

[6] Notably, several of the decisions cited by Cabot did involve some actual refusal by lessors to surrender possession of leasehold premises. *See, e.g., Bingham*, 420 P.2d (…continued)

consistent with the prevailing substantive law of this Commonwealth, the mere pursuit of declaratory relief challenging the validity of a lease does not amount to such.

Having answered the certified question, this matter is returned to the Third Circuit.

Messrs. Justice Eakin and Baer, Madame Justice Todd and Mr. Justice Stevens join the opinion.

---

(continued…)

at 841-42 (explaining that lessors had refused rentals and were unwilling to accept drilling by the lessee pursuing an equitable extension and concluding that the lessors therefore had "repudiated the lease by their various actions"), *cited in* Brief for Appellant at 24; *Muller v. Leyendecker*, 697 S.W.2d 668, 672 (Tex. Ct. App. 1985) ("[P]laintiff on several occasions peaceably demanded entry into and rightful possession of his lease premises.  However, defendants refused plaintiffs' possession of the leased premises."), *cited in* Brief for Appellant at 22, 38.  Certainly, this is not true of all (or even perhaps the majority) of the cases cited by Appellant.  *See, e.g.*, *Greer*, 25 N.E.2d at 810 ("It has been suggested that [the lessee] could have proceeded to drill without regard to the suit and should not be permitted to claim the benefit of an estoppel unless it was actually prevented by court order or otherwise.  In the cases from foreign jurisdictions this was not required, and when the great loss the lessee might suffer by successfully drilling a well and then losing title to the land is considered, we do not think that it should be required.").  Our point here is that the cases, factually at least, are not homogenous, and that some of the factual scenarios presented may reflect a repudiation and, thus, could yield the potential for redress upon the application of Pennsylvania law.