J-A16011-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| NICHOLAS D. ANDREWS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CROSS ATLANTIC CAPITAL PARTNERS, INC., | |
| Appellant | |
| _____ | |
| NICHOLAS D. ANDREWS | |
| Appellant | |
| v. | |
| DONALD R. CALDWELL, | |
| Appellee | No. 1694 EDA 2014 |

Appeal from the Judgment Entered May 22, 2014
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2011-06164
2011-09776-CT

| | |
|---|---|
| NICHOLAS D. ANDREWS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CROSS ATLANTIC CAPITAL PARTNERS, INC., | |
| Appellant | |
| _____ | |

J-A16011-15

NICHOLAS D. ANDREWS

                Appellee

       v.

DONALD R. CALDWELL,

                Appellant

No. 1825 EDA 2014

Appeal from the Judgment Entered May 22, 2014
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2011-06164


NICHOLAS D. ANDREWS

                Appellant

       v.

CROSS ATLANTIC CAPITAL PARTNERS, INC.,

                Appellee

_____

NICHOLAS D. ANDREWS

                Appellant

       v.

DONALD R. CALDWELL,

                Appellee

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1934 EDA 2014

Appeal from the Judgment Entered May 22, 2014
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2011-06164-CT

- 2 -

J-A16011-15

BEFORE: LAZARUS, J., JENKINS, J., and PLATT, J.[*]

CONCURRING AND DISSENTING MEMORANDUM BY JENKINS, J.:

**FILED SEPTEMBER 09, 2015**

I agree with the decision of my distinguished colleagues at 1934 EDA 2014 to quash the appeal of Nicholas Andrews. I further agree with my colleagues' decision at 1694 EDA 2014 to affirm the trial court's order denying Andrews' motion for costs and expert fees.

I respectfully dissent from the decision of my colleagues in the majority at 1825 EDA 2014 to affirm the judgment entered in Andrews' favor against Cross Atlantic Capital Partners ("CACP") and Donald Caldwell (collectively "Appellants"). In my view, the trial court erred in denying appellants' post-verdict motion seeking judgment n.o.v. on the ground that the statute of limitations expired years before Andrews filed suit. Because I find this issue dispositive, I will not address any other issues raised by appellants.

A motion for judgment n.o.v. is a post-trial motion in which the verdict loser requests the court to enter judgment in its favor. There are two bases on which the court can grant judgment n.o.v.:

> [O]ne, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record

---

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Polett v. Public Communications, Inc.*, 83 A.3d 205, 212 (Pa.Super.2013). In an appeal from the trial court's decision to deny judgment n.o.v., "[we must consider] the evidence in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Nelson v. Airco Welders Supply*, 107 A.3d 146, 154 (Pa.Super.2014) (en banc). We will reverse a trial court's denial of a judgment n.o.v. only when we find an abuse of discretion or an error of law that controlled the outcome of the case. *Polett*, 83 A.3d at 211.

Viewed in the light most favorable to Andrews, the verdict winner, the following evidence was adduced during trial. CACP is a private equity firm that raises capital from institutional investors and places that capital in specially created investment funds. Each fund uses its capital to purchase equity interests in promising companies, known as the fund's portfolio companies.

Each investment fund is a partnership with a general partner and a number of limited partners. The general partner serves as the investment manager: it oversees the fund, makes investment decisions, and provides

strategic advice to the portfolio companies. CACP is the general partner, and thus the investment manager, of each fund. The limited partners are passive investors who put up most of the capital for each fund and bear most of the risk. In return, they receive an ownership interest in each fund and are entitled to most of the profits. The general partner contributes a smaller portion of capital to each fund and is entitled to some profits, but with lower priority than the limited partners.

In 1999, at the height of the dot-com boom, CACP formed an investment fund called the Technology Fund, L.P. (the "Technology Fund") to invest in tech companies. The Technology Fund's general partner was XATF Management, L.P. ("XATF"). CACP was XATF's general partner and investment manager of the Technology Fund. About 100 investors acted as the Technology Fund's limited partners and invested about $114 million. XATF invested an additional $6 million.

Andrews graduated from the Wharton School of the University of Pennsylvania in 1993. His first job was with Firemark Investments, a private equity firm, which terminated him in 1998. On September 1, 1999, Andrews accepted an offer to join CACP as a principal on an at-will basis. Principals at CACP have no ownership interest in CACP or in the funds for which CACP serves as investment manager. Andrews' responsibilities at CACP included researching prospective portfolio companies, conducting market research, and meeting with entrepreneurs. He received a salary of $125,000.00, the

opportunity to earn a bonus of $75,000.00 at the end of his first year of employment, and health and dental benefits. He also received the opportunity to earn up to one point of "carried interest" in the Technology Fund, i.e., one percent of the Technology Fund's excess profits. Under CACP's standard practice, an employee's carried interest did not begin to vest until the first anniversary of employment. Andrews was never an investor in the Technology Fund.

Much of Andrews' work at CACP involved researching GAIN Capital ("GAIN") as a potential investment for the Technology Fund. At CACP's request, Andrews negotiated the terms of CACP's investment in GAIN and recommended that CACP invest $2.5 million in GAIN in return for a 22.75% ownership interest. GAIN's CEO testified that Andrews did a good job in this endeavor.

According to CACP, the Technology Fund did not do as well as everyone had hoped. CACP admitted that the Fund was able to return to the limited partners and to the general partner their aggregate capital contributions ($120 million) and was able to pay some of the preferred return (interest) to the limited partners. CACP claimed, however, that the Technology Fund fell far short of generating excess profits. Accordingly, CACP has never distributed excess profits to any of the Technology Fund's limited partners, to its general partner, to any of CACP's partners, or to any of CACP's employees or former employees.

About nine months after Andrews joined CACP, CACP informed him that he was not going to be promoted to partner. Consequently, Andrews resigned on June 1, 2000. At the time of his departure, CACP and Andrews negotiated a separation agreement in which CACP agreed, among other things, to pay Andrews an amount equal to three months of additional salary plus a $75,000 bonus for which Andrews would have become eligible had he remained at CACP for an entire year instead of nine months. CACP also agreed to continue Andrews' medical and dental benefits for another three months.

Most importantly, CACP agreed in Paragraph 5 of the separation agreement that Andrews would share in the Technology Fund's "carried interest" if the Fund ever become successful enough to generate excess profits, thus waiving CACP's standard requirement that the right to carried interest does not vest until the first anniversary of employment. Paragraph 5 states in full:

> By the end of this Severance Period, you will have vested one year of service towards 1.0% of carried interest in CACP Technology Fund, L.P. and 0.5% carried interest in The Co-Investment 2000 Fund, L.P.[1] Therefore, you will receive 0.2% and 0.1 % carried interest as your earned and vested carry in CACP Technology Fund, L.P. and The Co-Investment 2000 Fund, L.P., respectively. In addition, as special consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to

---

[1] The Co-Investment 2000 Fund's carried interest is not at issue in this case.

all other Limited Partners of the funds. Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.

The separation agreement does not define "carried interest", and CACP and Andrews disagreed as to its meaning. CACP argued at trial that carried interest is a distribution of the Technology Fund's excess profits which cannot take place until after CACP returns capital and interest to the limited partners. In CACP's view, for Andrews to receive carried interest, the Technology Fund *as a whole* must make a profit. Andrews maintained at trial that he must receive carried interest anytime CACP distributed any money, including capital, from sales of GAIN shares. In other words, it was not necessary for the entire Technology Fund to make a profit before Andrews received carried interest; the only requisite was that CACP sell shares of GAIN stock. Andrews labeled his interpretation of carried interest as his right to "deal-specific" carried interest.

On September 3, 2003, three years after leaving the company, Andrews learned from a press release that a number of GAIN shareholders had sold a significant portion of their shares. N.T., 8/27/13, at 75-77. On September 4, 2003, Andrews sent Brian Adamsky, CACP's CFO, an email inquiring whether the Technology Fund was among those shareholders. Plaintiff's Exhibit 6. Andrews wrote:

> I saw the press release for Gain's [deal] with Tudor on VentureWire, and noticed in Mark's quote a reference to 'liquidity to existing shareholders'. Did XATF sell some or all of its position

into the round? If so, *the sale would trigger an obligation under my separation agreement*, so please advise as to the amount and timing of payment to me.

*Id*. (italics added).  In other words, Andrews claimed that if XATF sold GAIN stock, then CACP owed Andrews one percent of the proceeds from the sale of the shares, based on Andrews' construction of the third sentence of paragraph 5 of the separation agreement.

Later on September 4th, Glenn Rieger, CACP's president, responded to Andrews via email:

Nick - It has been a while, I hope all is well! GAIN has made a lot of progress since your resignation from CACP, and continues to be one of our better performing companies. As we were putting this transaction together with Tudor *I had in the back of my mind our contractual obligations to you. Believe me if I felt there was an obligation to payout to you, I would be the first to contact you because that would mean a payout to me as well.*

The $10MM deal with Tudor was a series C round with all but $1MM being used to redeem common A & B stock.  Mark is the largest recipient in the group clearing over $6 MM personally.  *XATF is receiving $1.1 MM to be distributed to its [limited partners]* while retaining between 18.8-19.4% ownership based on an EBITDA[2] ratchet that will not be finalized until 12/31/04.

*The operative sentence of your agreement is the last sentence of paragraph #5 -"Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds."*  **Since XATF is not into its carry at this time, there is no distribution to the GP under the carry provision of the Partnership Agreement and hence, no distribution to any**

_____

[2] EBITDA is an acronym for "earnings before interest, taxes, depreciation and amoritization."  Andrews does not claim that the reference to EBITDA helps his case, so I need not address it further.

> ***employees/partners/others from the GP as a result of this
> transaction.*** I will keep you posted on the outcome of the fund
> as it may relate to any carry as those events occur*.*

Plaintiff's Exhibit 6 (italics and bolding added).

A few days later, on September 9th, Andrews sent Rieger the following

email:

> I went over to my storage place and dug out the separation
> agreement and my attendant materials, and in reading the file
> confirmed *that* ***we have a genuine disagreement about the
> nature of the agreement****.* While this is not a big deal when the
> immediate amount involved is $11,000 I think we can agree that
> *we are better off reconciling our views before the number goes
> up*.
>
> Paragraph 5 of the agreement is language you proposed. *While I
> think I can understand how you read the 'if still employed clause
> to create some ambiguity as regards the fund-level carry, as
> regards the gain-specific 'carry'* **there can be no doubt** *about
> the intent and meaning of '...special recognition...to be earned,
> paid, and distributed at such time as the distribution is made
> to—Limited Partners.'* Obviously this language is all
> contextualized by the fact that I was not an LP myself, by the
> lack of a predecessor agreement or other basis for an 'if still
> employed' comparison, and most of all by the performance gap
> between Gain and XATF.
>
> I think we all expected at the time of the agreement, and still
> hope today, that XATF would and will make payouts.  (I'm
> actually quite encouraged by your email in this regard - if you
> were thinking about me on this deal but expecting to pay all
> early simultaneously, XATF must be pretty close to paying out.)
> Nonetheless, ***I think we should prepare for the possibility
> that Gain winds up positive and XATF negative by
> clarifying the language of paragraph 5 as soon as
> possible***.

Plaintiff's Exhibit 6 (italics and bolding added).

For the next seven years, Andrews did nothing further. He admitted at trial that he failed to "follow up with" anyone at CACP about the fundamental disagreement to which he had devoted his September 9, 2003 email. He said that although he was supposed to receive $11,000.00 in September 2003 at the time of distribution to the limited partners, it made no sense on a cost-benefit basis to hire an attorney to recover $11,000.00. N.T., 8/26/13, at 129-30. He conceded that he made no effort to clarify the language of the separation agreement. N.T., 8/27/13, at 84. He even admitted that he had visited CACP's offices a few times between 2003 and 2010 but did not raise the carried interest issue with anyone during his visits. *Id*. at 84-85. During the same seven-year period, however, Andrew followed GAIN's progress by reading press releases and by searching the internet. *Id*. at 85-86. Information readily accessible in the public domain showed that GAIN was increasing in value and was making significant purchases of shares from its existing shareholders. *Id*. at 86-87. One press release specifically named CACP as being among these shareholders. *Id*. at 91.

In December 2010, seven years after Andrews believed CACP had breached the separation agreement and had caused him damages, Andrews made further inquiries to CACP about the Technology Fund. N.T., 8/26/13, at 129-31. As a result of those inquiries, CACP CFO Adamsky sent Andrews the most recent available financial data about the fund, including data about the fund's GAIN-related distributions. *Id*. at 132-33, 138-39. Adamsky

wrote to Andrews in 2011: "We will let you know if there are any dramatic changes in the XATF fund which would make a carry allocation a possibility …"

Sales of the Technology Fund's shares in GAIN resulted in six distributions of the following amounts on the following dates:

| | |
|---|---|
| September 10, 2003: | $ 1,090,381.00 |
| April 4, 2006: | $ 10,000,004.00 |
| January 14, 2008: | $ 42,433,651.00 |
| December 21, 2010: | $ 14,993,616.00 |
| March 15, 2012: | $ 3,666,451.00 |
| February 13, 2013: | $ 3,128,423.00 |
| | |
| Aggregate distributions: | $ 75,311,526.00 |

N.T., 8/28/13, at 36-38. All distributions repaid capital contributions and preferred return to the Fund's investors. *Id*. at 44. None of these distributions were distributions of excess profits, because the Technology Fund never generated excess profits.

In 2011, Andrews filed an action alleging breach of contract against CACP and breach of the Wage Payment Collection Law ("WPCL") against CACP and CACP's CEO, Caldwell. The breach of contract claim asserted that CACP breached its duty to make payments due under the separation agreement. The WPCL claim contended that the payments due under the separation agreement constituted unpaid "wages". Andrews claimed that he was entitled to damages of one percent of the total distributions, or more than $750,000.00. Both before and during trial, Appellants requested dismissal of Andrews' action under the applicable statutes of limitations. At

the close of Andrews' case in chief, the trial court granted a nonsuit to Appellants as to the September 2003 distribution. But at both the nonsuit stage (N.T., 8/28/13, at 72-78) and directed verdict stage (N.T., 8/30/13, at 3-5), the trial court rejected the statute of limitations argument as to all distributions other than September 2003.

The jury completed a special verdict slip with 19 questions relating to liability, damages and the statute of limitations. The jury found that the discovery rule tolled the statute of limitations, and that Appellants failed to act in good faith under the separation agreement. The jury returned a verdict in the amount of $742,221.45 against Appellants. Subsequently, the trial court denied Appellants' timely post-verdict motions seeking judgment n.o.v. and/or a new trial. The court granted Andrews' post-verdict motions in part and added prejudgment interest and attorney fees to the verdict, resulting in a judgment of $1,216,617.70 in Andrews' favor.

Based on this evidence, Appellants argue that the trial court erred in denying their post-trial motion for judgment n.o.v. because, as a matter of law, the statute of limitations bars all of Andrews' breach of contract and WPCL claims. I agree.

Preliminarily, I find no merit in Andrews' claim that Appellants waived their statute of limitations argument. Appellants preserved the statute of limitations argument at every step by raising the statute in their answer to Andrews' complaint, their motion for compulsory nonsuit (N.T., 8/28/13, at

74), their motion for directed verdict (N.T., 8/30/13, at 3-4), their post-verdict motions seeking judgment n.o.v. and their Pa.R.A.P. 1925(b) statement. I now turn to the substance of Appellants' argument.

Statutes of limitations begin to run

as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations. A person asserting a claim is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period.

The statute of limitations requires aggrieved individuals to bring their claims within a certain time of the injury, so that the passage of time does not damage the defendant's ability to adequately defend against claims made the statute of limitations supplies the place of evidence lost or impaired by lapse of time, by raising a presumption which renders proof unnecessary. Statutes of limitations are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience.

*Aquilino v. Philadelphia Catholic Archdiocese*, 884 A.2d 1269, 1275 (Pa.Super.2005) (internal citations omitted). Statutes of limitations promote the state's interest in finality by preventing a plaintiff from sleeping on his rights "until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348–349 (1944).

The statute of limitations for WPCL actions is three years, 43 Pa.C.S. § 260.9a(g), and the statute of limitations for breach of contract actions is four years, 42 Pa.C.S. § 5525(8).

In my view, CACP's September 4, 2003 email to Andrews constitutes an anticipatory repudiation of Andrews' conception of carried interest under paragraph 5 of the separation agreement. Consequently, the statute of limitations began running on September 4, 2003 for Andrews' entire contract and WPCL claims. Contrary to Andrews' argument, each distribution by CACP did not give rise to a separate action with a separate limitations period. When the WPCL and contract statutes of limitations expired in 2006 and 2007, respectively, Andrews' actions became time-barred in their entirety.

**CACP's anticipatory repudiation**. A repudiation is an "absolute and unequivocal refusal to perform …" ***2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies of Greater Philadelphia***, 489 A.2d 733, 736 (Pa.1985). An "anticipatory repudiation" occurs in advance of (or in anticipation of) actual failure to perform the agreement. The burden of proving an anticipatory repudiation rests on the party asserting it. ***Shafer v. A.I.T.S.***, 428 A.2d 152, 155 (Pa.Super.1981).

An anticipatory repudiation gives the plaintiff the immediate right to sue for breach of contract. ***Weinglass v. Gibson***, 155 A. 439, 440 (Pa.1931). "The rationale behind the rule of anticipatory repudiation is the prevention of economic waste. An [obligee] should not be required to perform a useless act as a condition of his right to recover for a breach when the obligor has demonstrated an absolute and unequivocal refusal to

perform." ***2401 Pennsylvania Avenue Corp.***, 489 A.2d at 737. Thus, in ***Weinglas***, when a theatre owner booked an entertainer to give a performance in his theatre on a given date and time, and then booked another entertainer for that same date and time and advertised the latter's performance to the public, our Supreme Court held that the first entertainer (the plaintiff) could sue for breach of contract even though he had not actually gone to the theatre to tender performance. ***Id***., 155 A. at 440.

It is also illuminating to identify what does *not* constitute a repudiation. A mere missed payment in the course of an installment contract does not constitute repudiation, because the failure to pay an installment does not necessarily reflect the payor's unequivocal refusal to perform. ***R.C. Beeson, Inc. v. Coca Cola Co.***, 337 Fed.Appx. 241, 244 (3d Cir.2009) (citing Corbin on Contracts § 954) ("a single infraction of contractual obligations, such as a missed payment, is insufficient to constitute a 'total breach' of the agreement unless accompanied by an anticipatory repudiation of future performance").

Viewing Rieger's September 4, 2003 email and Andrews' September 9, 2003 email in the light most favorable to Andrews, giving Andrews the benefit of every reasonable inference, I conclude that Rieger communicated three points in his September 4, 2003 email: (1) the Technology Fund was receiving $1.1 million from the sale of GAIN stock and was distributing over 80% of this sum to its limited partners while retaining 18-19% as EBITDA;

(2) these distributions did not generate carried interest ("XATF is not into its carry at this time"), so Andrews was not eligible for payment of carried interest under paragraph 5 of the separation agreement; (3) Rieger himself was ineligible for payment because the sale of GAIN stock was not carried interest ("believe me if I felt there was an obligation to payout to you, I would be the first to contact you because that would mean a payout to me as well"). Through these points, Rieger repudiated Andrews' interpretation of "carried interest" in the separation agreement, for he clearly communicated that sales of GAIN stock and distributions to the limited partners and the general partner from these sales did not, by themselves, trigger Andrews' right to payment of carried interest.

In his September 9, 2003 response to Rieger, Andrews recognized that Rieger had repudiated his interpretation of "carried interest", stating that "*we have a genuine disagreement* about the nature of the [separation] agreement," and that "*there can be no doubt*" that his interpretation of "carried interest" was correct. Andrews urged that "*we are better off reconciling our views* before the number goes up" beyond $11,000.00, the amount that Andrews claimed CACP owed him from the 2003 sale of GAIN stock.

Even when construed in the light most favorable to Andrews, this evidence compels one, and only one, conclusion: in September 2003, CACP, through Rieger, unequivocally repudiated Andrews' position that CACP owed

him carried interest each time CACP sold GAIN stock. Moreover, Andrews understood that CACP rejected his interpretation of carried interest. **2401 Pennsylvania Avenue Corp.**, 489 A.2d at 736 (defining repudiation).

Andrews insists that the final sentence of Rieger's September 4, 2003 email -- "I will keep you posted on the outcome of the fund as it may relate to any carry as those events occur" – shows that the email is not a repudiation, because it suggests that CACP would someday pay Andrews carried interest on sales of GAIN stock. The majority appears to rely on the final sentence as well by asserting on page 20 of their memorandum: "At most, the email exchange demonstrated that the parties were trying to work out differences in interpretation of paragraph 5, there would be no payment made in September 2003, but [CACP] would keep Andrews informed about the possibility of future payments." It is essential, however, to read the final sentence in context with the rest of Rieger's email; isolating a statement out of context can easily cause a court to derive *un*reasonable inferences from the statement, thus running afoul of the proper standard of review. **Nelson**, 107 A.3d at 154 (in appeal from denial of judgment n.o.v., verdict winner must be given the benefit of every "reasonable" inference of fact arising from the evidence). Read in context, the final sentence can have only one meaning, even giving Andrews the benefit of all reasonable inferences: Rieger stated, in so many words, that while sales of GAIN stock alone do not trigger CACP's obligation to pay carried interest, separate events *other than*

sales of GAIN stock may trigger this obligation, and CACP would contact Andrews upon the occurrence of *those* events. Rieger's email did not merely reject Andrews' right to payment for the 2003 sale of GAIN stock, as the trial court and the majority suggest; it rejected Andrews' right to payment for all future sales of GAIN stock. To construe Rieger's final sentence as leaving open the possibility of payments of carried interest from future sales of GAIN stock is unreasonable, because this construction lifts the final sentence out of context from the detailed repudiation of this concept in the remainder of Rieger's email.

The first decision cited by the majority in support of their contention that Rieger's email was not an anticipatory repudiation, **2401 Pennsylvania Avenue Corp.**, is factually distinguishable. There, a building owner entered into a commercial lease with the defendant ("putative tenant"), but the putative tenant was unable to take possession because a prior tenant still occupied some of the leasehold space. The owner granted the prior tenant an extension of time to vacate the building and asked the putative tenant to grant this extension. The putative tenant reacted by purchasing a different building and declining to honor the lease. The owner claimed that the putative tenant committed an anticipatory breach on the basis of the following facts: (a) the putative tenant stated on July 24, 1974 that "he was advised that the lease would have no effect because of the inability of [the owner] to give possession in May as called for in the lease"; (b) the owner's

inconclusive meeting with the putative tenant on July 30, 1974, (c) the owner met with the putative tenant on August 1, 1974, and the putative tenant declined to grant an extension to the prior tenant based on counsel's advice that the granting of an extension "would in essence, acknowledge the validity of the lease," and (d) on this same date, the putative tenant informed the owner that it "did not want to occupy the four floors, had no use for it, and would not consider any type of extension without a release, of liability from the lease." Our Supreme Court held:

> Whether viewed individually or collectively these statements are insufficient to [constitute] an absolute and unequivocal refusal. The July 24th statement that [the putative tenant] had been advised that the lease would have no effect because of [the owner]'s failure to deliver the space in May is insufficient because it does not provide a definitive indication that [the putative tenant] intends to act on this advice or treat the contract as void. [The putative tenant]'s August 1st statement that it did not wish to approve an extension for [the existing tenant] because it would lend validity to the lease does not indicate that it will in fact not perform. Moreover, [the putative tenant]'s statement that it had no use for the space and would not consider approving the extension without a release from its obligations under the lease indicates that [the putative tenant] did recognize at the very least a possible obligation under the contract. The fact that a party seeks to preserve what it deems to be a legal defense to the required performance does not reflect an intention to deliberately breach the agreement. To the contrary, it reflects an intention to avoid performance only if there is a legal basis for the refusal of performance.

*Id*., 489 A.2d at 737.

The present case differs from *2401 Pennsylvania Avenue Corp.* because, in the words of that decision, Rieger's email provided a "definitive indication" that CACP "[would] in fact not perform" the separation

- 20 -

agreement in the manner requested by Andrews. *Id*. Whereas the putative tenant in *2401 Pennsylvania Avenue Corp.* "recognize[d] … a possible obligation under the contract," *id*., Rieger unequivocally rejected Andrews' demand that CACP pay carried interest on sales of GAIN stock.

The second decision relied upon by the majority, *Harrison v. Cabot Oil & Gas Corp.*, 110 A.3d 178 (Pa.2015), is also distinguishable. *Harrison* held that the filing of a declaratory judgment action contesting the validity or scope of an agreement is not an anticipatory breach, because it "does not entail … an unequivocal refusal to perform." *Id*. at 184. The *Harrison* court cited with approval decisions from other jurisdictions that "an action for declaratory judgment does not indicate an unconditional refusal to comply with contractual obligations" but is merely a request for the court to "guide [the] parties in their future conduct in relation to each other." *Id*. at 185 & n. 4 (citing *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F.Supp.2d 562, 568 (D.Del.2009); *Seneca Ins. Co. v. Shipping Boxes I, LLC*, 30 F.Supp.3d 506, 511–12 (E.D.Va.2014)). The Court continued:

> Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his [contractual duties]. His statement is a repudiation if the threatened breach would, without more, have given the injured party a claim for damages for total breach. Modern procedural devices, *such as the declaratory judgment,* may be used to mitigate the harsh results that might otherwise result from this rule.

*Id*. at 185 (citing Restatement (Second) of Contracts, § 250 cmt. d (1981)) (emphasis in original).

In this case, CACP did more than file a declaratory judgment action seeking the court's guidance on the separation agreement. Rieger's email definitively rejected Andrews' demand for payment of carried interest from sales of GAIN stock. To paraphrase **Harrison**, Rieger's email was a repudiation because, "without more, [it gave Andrews,] the injured party[,] a claim for damages for total breach." *Id*., 110 A.3d at 185. Indeed, Andrews' statements in his response to Rieger's email – "we have a genuine disagreement about the nature of the agreement," "there can be no doubt about [the separation agreement's] intent and meaning", and "we are better off reconciling our views before the number goes up" – implicitly admit that Rieger's email gave him a claim for total breach. He elected to refrain from suing in 2003 not because he harbored any doubt about whether Rieger repudiated his interpretation of carried interest, but only because he felt there was little economic benefit in suing for $11,000.00, the amount he claimed was due at that time. Andrews' business decision to refrain from suing did not transform Rieger's email into something other than an unequivocal repudiation.

**There is only one limitation period, and it commenced on the date of repudiation.** Andrews argues that each payment owed to him by CACP gave rise to a separate cause of action with a separate limitation

period.  Andrews equates his case with installment contract cases where a separate statute begins running each time the defendant misses an installment.  *See Ritter v. Theodore Pendergrass Teddy Bear Prod., Inc.*, 514 A.2d 930, 938 (Pa.Super.1986) ("where installment or periodic payments are owed, a separate and distinct cause of action accrues for each payment as it becomes due").

CACP responds by arguing that the installment contract principle does not apply when the defendant repudiates the contract.  In the event of repudiation, CACP argues, there is only one statute of limitations period for all payments which begins to run on the date of repudiation.

Relying on *Total Control v. Danaher Corp.*, 359 F.Supp.2d 387 (E.D.Pa. 2005), the trial court held that a separate statute of limitations ran for each installment that CACP failed to pay.  The court held that Andrews knew or should have known about the 2003 sale of GAIN shares, and therefore the statute of limitations for this particular payment began running in 2003 and expired before Andrews' lawsuit.  As to the other sales, the court held that Andrews neither knew nor should have known that CACP made additional sales of GAIN stock, and therefore the statute on each subsequent claim did not expire before Andrews filed suit.

I conclude that the installment contract principle does not apply when the defendant repudiates the contract.  In such circumstances, there is only one limitations period which begins to run on the date of repudiation.  I base

my opinion on a decision from our Supreme Court, *Barr v. Luckenbill*, 41 A.2d 627 (Pa.1945), and on persuasive authorities from other courts. In *Barr*, the plaintiff loaned the defendant $7,500.00 which the defendant agreed to invest for plaintiff in securities. Pending this investment, the defendant was to have the use of the money for his own purposes and to pay 3% interest thereon. Instead of investing the money for the plaintiff's benefit, the defendant loaned $4,500.00 to a third person, one Zuber. The defendant never repaid the $4,500.00 to the plaintiff and only paid interest on the remaining $3,000.00. Ten years after the defendant's loan to Zuber, the plaintiff sued the defendant for failure to repay the $4,500.00 principal and annual installments of 3% interest. Our Supreme Court held that by making the loan to Zuber, the defendant "repudiated any further obligation on his part for the $4,500, and plaintiff's right of action to recover that sum thereupon arose. As this occurred more than ten years before the present suit was begun, the claim would clearly seem to be barred by the statute of limitations." *Id*. at 629. There was no separate right of action for each interest payment that became due after the defendant's repudiation of the loan agreement. A single right of action, with a single statute of limitations, arose for the entire loan agreement on the date of repudiation.

A number of federal decisions are consistent with *Barr.* In *Welch Foods v. Borough of N. E.,* 46 F. App'x 678 (3d Cir.2002), a case decided under Pennsylvania law, a manufacturer contracted with the borough to use

the borough's waste-disposal facilities at special rates. A few years later, the borough passed an ordinance raising these rates and began billing the manufacturer at those higher rates. About twenty years later, the manufacturer sued the borough for breach of contract, demanding the monies it had been overbilled in the preceding decades. The Third Circuit held that the statute of limitations barred the manufacturer's claims in their entirety -- even as to damages allegedly incurred within the limitations period (i.e., within four years of the manufacturer's lawsuit). The court recited the rule that "[i]n analyzing when the statute of limitations begins to run on a continuing contract, we must focus on the type of breach. Where there was an outright repudiation [of the contract], ... the statute of limitations [begins] to run at that point." *Id.* at 682. The court reasoned that the borough's ordinance amounted to an outright repudiation of its pre-existing contract with the manufacturer. Accordingly, "any cause of action arising out of this repudiation accrued on the date of passage of this Ordinance." *Id.* The court relied on its decision in *Henglein v. Colt Indus.,* 260 F.3d 201 (3d Cir. 2001)*,* an ERISA case, wherein a group of terminated employees sued their former employer -- the operator of a steel plant that had shut down -- for breaching a pension plan agreement to pay them lifetime shutdown benefits. At the time of termination, the employer informed the employees that they would not receive lifetime shutdown benefits. The Third Circuit held that on the date of termination, the

employer had committed an "outright repudiation," so the employees' *entire* cause of action for lifetime shutdown benefits accrued at that time. *Id.* at 214. Due to this repudiation, a separate cause of action did not arise each time the employer withheld an installment of shutdown benefit payments. *Id.* at 214; *see also Algayer v. Metro. Life Ins.* **Co.**, 2004 WL 1588232, *2 (E.D.Pa., July 12, 2004) ("the general rule governing installment contracts does not apply when an employer or insurer has completely repudiated an obligation to make periodic payments to an employee or plan participant, and the period of limitation instead begins at the time of repudiation").

These decisions make considerable sense. Because the plaintiff's right to entire recovery ripens immediately upon repudiation, *2401 Pennsylvania Avenue Corp.*, 489 A.2d at 737, logic dictates that the statute of limitations begins running for the entire action at the time of repudiation. In an installment contract setting, it is illogical for an entire right of recovery to mature at the time of repudiation but for separate and distinct statutes of limitation to apply to each installment payment. Yet that is what Andrews would have us hold. In his view, even though he knew perfectly well in September 2003 that CACP had repudiated the separation agreement, he enjoys a new right of action for each sale of GAIN stock -- even sales that take place decades later.

Based on these precedents, I conclude that the statute of limitations began to run on Andrews' entire contract and WPCL claims on September 4, 2003, when Rieger repudiated Andrews' construction of the separation agreement. Due to Rieger's repudiation, the installment contract principle under which a separate statute of limitations runs for each missed installment does not govern this case. The three-year statute of limitations on Andrews' WPCL claim expired on Tuesday, September 5, 2006,[3] and the four-year statute for Andrews' contract action expired on September 4, 2007. Andrews' 2011 lawsuit is time-barred in its entirety.

*Total Control*, the federal decision relied upon by the trial court, is unpersuasive. The promisor in *Total Control* never repudiated the installment contract; it simply stopped making installment payments. *Id*., 359 F.Supp.2d at 391. Because it merely missed payments instead of repudiating the contract, a separate statute of limitations ran for each non-payment. Rieger's repudiation distinguishes this case from *Total Control*.

---

[3] Monday, September 4, 2006, was Labor Day, so the statute expired on the next business day, September 5, 2006. *See* 1 Pa.C.S. § 1908 ("when any period of time is referred to in any statute, such period in all cases, except as otherwise provided in section 1909 of this title (relating to publication for successive weeks) and section 1910 of this title (relating to computation of months) shall be so computed as to exclude the first and include the last day of such period. Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation").

The decisions cited in Andrews' brief are distinguishable for the same reason. For example, in ***Pennsylvania Turnpike Comm'n v. ARCO***, 375 A.2d 890 (Pa.Cmwlth.1977), an oil company entered into a long-term lease with the Turnpike Commission to operate a gas station along the Pennsylvania Turnpike. The lease prescribed that rent was payable on a monthly basis. The parties disputed the gas station's computation of rent from time to time over their twenty-year relationship, but neither party repudiated the lease. After twenty years, the Turnpike Commission brought an action to recover damages for alleged underpayment of rent by the oil company during the preceding six years of installment payments, the applicable limitations period for contract claims at that time. The Commonwealth Court declined to apply the statute of limitations, explaining that "the Commission could have no cause of action until each allegedly improperly computed payment was made and, as to each such payment, a separate and distinct cause of action would accrue." ***Id.*** at 892. That conclusion was logical because the oil company, unlike CACP, never repudiated the contract. ***See also Van Seiver v. Van Seiver***, 12 A.2d 108, 110 (Pa.1940) (separate statute ran for each deficient alimony payment, where deficiencies appeared to be unintentional, and there was no suggestion in Supreme Court's opinion that husband had repudiated his alimony obligations); ***Ritter***, 514 A.2d at 935 (separate statute ran for each

missed installment; no suggestion in this Court's opinion that defendant repudiated contract).

For these reasons, I respectfully dissent from the majority's decision at 1825 EDA 2014 to affirm the judgment entered in Andrews' favor. I would reverse and remand for entry of judgment n.o.v. in favor of appellants. I concur with the majority's decisions at 1694 EDA 2014 and 1934 EDA 2014.